# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS
# EASTERN DIVISION

DAVID BONIFACE,

NISSAGE MARTYR, and

JUDERS YSEMÉ;

     *Plaintiffs*,

v.

JEAN MOROSE VILIENA
(a.k.a JEAN MOROSE VILLIENA)**,**

     *Defendant*.

**Civil Action No. _____**

**COMPLAINT FOR DAMAGES AND
INJUNCTIVE RELIEF**

1. **EXTRAJUDICIAL KILLING**
2. **ATTEMPTED EXTRAJUDICIAL KILLING**
3. **TORTURE**
4. **CRIMES AGAINST HUMANITY**
5. **ARSON**

JURY TRIAL DEMANDED

     Plaintiffs David Boniface, Nissage Martyr, and Juders Ysemé (collectively "Plaintiffs") complain and allege as follows.

## PRELIMINARY STATEMENT

     1.     This case arises from the brutal torture, killing, and persecution of media activists and human rights advocates in the Haitian town of Les Irois (pop. 22,306) between 2007 and 2009.  As the Mayor of Les Irois, the defendant, Jean Morose Viliena (hereinafter "Viliena"), personally led an armed group aligned with his political party in a series of attacks on his critics and perceived political opponents in Les Irois.

     2.     Specifically, in retribution against Plaintiff David Boniface for accusing Viliena of misconduct in office, Viliena and his associates killed Plaintiff Boniface's younger brother, Eclesiaste Boniface.  Viliena and his associates also tortured and attempted to extrajudicially kill Plaintiffs Nissage Martyr and Juders Ysemé during a raid on a community radio station.  Finally,

Viliena and his associates destroyed 36 homes in a rampage of arson targeting Plaintiffs and other opposition party members.

3.      Viliena and his associates have obstructed Plaintiffs' efforts to seek justice in Haiti by tampering with witnesses and engaging in a pattern of coercion and intimidation, as explained below.  In or around January 2009, after Haitian prosecutors launched a criminal investigation into his misconduct in office, Viliena fled to the United States in an apparent effort to avoid prosecution.  Viliena currently resides in Malden, Massachusetts.

4.      Plaintiffs seek compensatory and punitive damages and injunctive relief for torts in violation of international and domestic law.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over Plaintiffs' claims of torture, extrajudicial killing, and attempted extrajudicial killing under 28 U.S.C. § 1331, as these actions arise under the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note).

6.      This Court has jurisdiction over Plaintiffs' claims for crimes against humanity as torts in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350.

7.      This Court has supplemental jurisdiction over Plaintiffs' claims based on the laws of the Republic of Haiti pursuant to 28 U.S.C. § 1367.

8.      Viliena is a resident of Malden, Massachusetts.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (c)(1).

## PARTIES

### *Defendant*

9.      On information and belief, Defendant Jean Morose Viliena is a citizen of Haiti and a lawful permanent resident of the United States. He currently resides in or around Malden, Massachusetts.

10.     On information and belief, Viliena is currently employed as a school-bus driver in Massachusetts.

11.     In December 2006, Viliena was elected Mayor of Les Irois as a candidate for the Haitian Democratic and Reform Movement (hereinafter "MODEREH") political party (*see* discussion *infra*, ¶¶ 24-27).  MODEREH is an acronym for the party's French-language name, the *Mouvement démocratique et rénovateur d'Haïti*.  Viliena held elected office as Mayor of Les Irois until approximately February 2010.

12.     As a candidate and as Mayor, Viliena was backed by a powerful political machine called KOREGA, which controls politics throughout the southwestern region of Haiti (the Grand-Anse Department) through a system of patronage, strong-arm tactics, threats, and armed violence.  At all relevant times, as Mayor of Les Irois, Viliena personally supervised his mayoral staff and security detail, and led an armed group in Les Irois aligned with the KOREGA political machine (hereinafter the "KOREGA militia") (*see* discussion *infra*, ¶25).

13.     Viliena fled to the Boston area in or around January 2009 following the opening of a criminal investigation into his human rights abuses and those of his associates. From his base in Massachusetts, Viliena continued to participate in a conspiracy with other members of the KOREGA militia to persecute Plaintiffs and other perceived political opponents in Les Irois through acts of violence and destruction. At all relevant times herein, Viliena was a lawful permanent resident of the United States.

14.     On or around August 27, 2012, Viliena was appointed by former Haitian President Michel Martelly to serve as the "Interim Executive Agent" for Les Irois.  Under the Haitian Constitution, Mayors must be elected to office.  However, former President Martelly has replaced numerous Mayors with handpicked Interim Executive Agents in lieu of holding elections.  As Interim Executive Agent for Les Irois, Viliena exercised the functions of Mayor, despite the expiration of his elected term of office, his continued residence in Massachusetts, and an open criminal indictment against him (*see* discussion *infra*, ¶62).  On information and belief, Viliena's term as Interim Executive Agent expired in or around October 2015.  He no longer holds public office in Haiti.

*Plaintiffs*

15.     Plaintiff David Boniface ("Boniface") is a citizen of Haiti, currently residing in Les Irois, Haiti.  Boniface is a grade school teacher and a human rights advocate.  As a representative in training with a local human rights organization, Boniface served as a trial observer in Les Irois.  Boniface is also a supporter of the opposition political party in Les Irois, called the Struggling People's Party.  In Haiti, the Struggling People's Party is known by its French-language name, the *Organisation du Peuple en Lutte*.  Under Haitian law, David Boniface is heir-at-law of his brother, Eclesiaste Boniface, who was killed in retaliation for David Boniface's in-court statements against Viliena's misconduct.

16.     Plaintiff Nissage Martyr ("Martyr") is a citizen of Haiti, currently residing in Les Irois, Haiti.  Martyr is also a supporter of the Struggling People's Party.  Martyr rented out part of his home to a community radio station operated and financed by members of the Struggling People's Party.  Martyr's support of the radio station and the Struggling People's Party made him a target for Viliena and the KOREGA militia.

17.     Plaintiff Juders Ysemé ("Ysemé") is a citizen of Haiti, currently residing in Les Irois, Haiti.  Although not employed by the Les Irois community radio station, Ysemé enjoyed spending time there before and after attending high school classes.  The radio station was the first in Les Irois; Ysemé was excited by the novelty of the station and by its plans to open the first internet café in Les Irois.  Ysemé became a target for Viliena and the KOREGA militia because of his association with the radio station and his perceived support of the Struggling People's Party.

## BACKGROUND

### Political Violence and the Collapse of the Rule of Law in Haiti

18.     On February 29, 2004, former Haitian President Jean-Bertrand Aristide was overthrown in a violent *coup d'état* led by remnants of Haiti's disbanded Armed Forces,

paramilitary units, and armed bands of disaffected youths.  From 2004 to 2006, an unelected transitional government was in place in Haiti.

19.     Following the 2004 coup, the United Nations intervened in Haiti to address the political instability and human rights crisis.  On April 30, 2004, the U.N. Security Council adopted Resolution 1542, establishing the United Nations Stabilization Mission in Haiti ("U.N. Mission"), also referred to by its French-language acronym, MINUSTAH.  Comprised of civilian police, technical advisors, and military personnel, the U.N. Mission was given a mandate to assist Haiti's transitional government in maintaining security, restoring democracy, and ensuring the protection of human rights.

20.     The 2004 coup and its aftermath left a power vacuum in Haiti.  As Haiti and the U.N. Mission struggled with the security and logistical problems of organizing democratic elections, a bewildering array of political parties—at least 70 nationwide—competed for popular support.  On one extreme, former paramilitary members and supporters of the François Duvalier ("Papa Doc") (1957–1971) and Jean-Claude Duvalier ("Baby Doc") (1971–1986) dictatorships sought to retake power.  On the other side of the political spectrum, the *Fanmi Lavalas* party of former President Aristide splintered into a number of competing factions, including the Struggling People's Party, as well as the affiliated MODEREH party and KOREGA political machine.

21.     Since the 2004 coup, government institutions have remained weak and unable to reestablish the rule of law.  The Haitian Armed Forces—responsible for numerous massacres from the 1960s through the 1990s—were disbanded in 1995.  According to international observers, the Haitian National Police is chronically undertrained and underfunded, and plagued by unchecked corruption and brutality.  At the same time, Haiti's justice system is highly dysfunctional, with rampant corruption, politicization, and a lack of training and resources.

22.     In the absence of stable security forces and judicial accountability, political parties and rival government officials have used informal armed groups to gain and exercise power.  As a result, political violence has killed thousands of Haitians since the 2004 coup.

Armed groups aligned with political parties routinely kidnap, torture, and kill political opponents, journalists, and human rights advocates, while meting out vigilante justice, collecting bribes, and ensuring loyalty in the face of collapsed law enforcement institutions.  Haitians have developed a rich vocabulary of creole slang to describe these armed groups: *attachés*, *chimères*, *cagoulards*, *macoutes*, and *zenglendos*.

23.     Haiti's political instability has continued throughout the contested presidential elections of 2006, 2010, 2011, 2015, and 2016.  Political violence continues to be rampant, with political parties and government officials mobilizing armed factions of supporters.

### Election of Jean Morose Viliena in Les Irois

24.     In Les Irois, local politics has followed the same violent trend.  In December 2006, Viliena ran for office in the Les Irois mayoral elections as a candidate from the MODEREH party.  Viliena's main rival in the election was a candidate from the Struggling People's Party, Pastor William Lebon.

25.     Viliena was backed by KOREGA, a powerful political machine that dominates local politics throughout the Grand-Anse Department (the region covering the southwestern coast of Haiti, including Les Irois).  KOREGA stands for the Committee for Resistance in Grande-Anse, or in Creole, *Komite Reziztans Grand-Anse*.  KOREGA is a regional political machine that backs chosen candidates in cities across Grand-Anse as part of a patronage system.  Over the past several years, KOREGA has established a network of local branches capable of arming and mobilizing groups of KOREGA members, such as the KOREGA militia in Les Irois.  Through these armed groups, KOREGA applies strong-arm tactics and political muscle to influence elections, interfere with investigations and prosecutions, silence critics, and suppress political opposition in cities and towns across Grand-Anse.  In return for their loyalty, KOREGA provides its members with jobs, motorcycles, and control of local institutions and government posts.  In recent years, KOREGA has aligned itself with former President Martelly's party.

26.     With KOREGA's support, Viliena was elected to a four-year term as Mayor of Les Irois on December 3, 2006, in an election marked by voter fraud, intimidation and violence.

Pierrot Boileau, a KOREGA member who later served on Viliena's mayoral staff, paid voters on Pont-Pigy Boulevard to vote for Viliena.  On Election Day, KOREGA members—including a candidate for vice mayor on Viliena's ballot—vandalized the home of opposition candidate Pastor William Lebon, intimidated his family, and killed a dog at his residence to punctuate their threats.

27.     During Viliena's time in office, the 2006 election violence became a blueprint for Viliena's strategy to silence critics and neutralize local supporters of the Struggling People's Party—KOREGA's chief political rival in the region.

## STATEMENT OF FACTS

28.     Viliena assumed the office of Mayor in or around December 2006.  Once in power, Viliena became the head of the Les Irois branch of KOREGA and exercised control over the KOREGA militia's operations in Les Irois, using violence to accomplish his political ends. The KOREGA militia operated as an extension of Mayor Viliena's office in Les Irois.  Hautefort Bajon, a KOREGA member and former mayor of Les Irois, served as Viliena's campaign manager and later as his Chief of Staff.  Several other members of Viliena's mayoral staff and security detail actively participated in the KOREGA militia's attacks, including his security guards, Pierrot Boileau and Meritus Beaublanc.  Acting under Mayor Viliena's direct supervision, the KOREGA militia enforced Viliena's policies of censoring critics and violently persecuting dissidents in Les Irois.

### The Extrajudicial Killing of Eclesiaste Boniface (July 27, 2007)

29.     Viliena's campaign of persecution against Plaintiffs began when David Boniface sought to protect the human rights of a neighbor assaulted by Viliena.  On the morning of July 27, 2007, Viliena was accompanying a sanitation crew through the streets of Les Irois.  Ostanie Mersier, a resident of Pont-Pigy Boulevard, was cleaning her yard, which had been littered from the previous day's street market.  Mersier piled the market litter in the street for collection.

30.     Viliena confronted Mersier and accused her of piling her own garbage in the street.  He then dumped a wheelbarrow full of litter and manure onto Mersier's yard.  When

Mersier protested, Viliena pulled out his gun and hit Mersier on the head.  Mersier immediately left to file an incident report before the local Justice of the Peace, Judge Saint Bell.  Viliena followed her to Judge Bell's residence to demand her arrest.

31.    As a trial monitor for a local human rights organization, Plaintiff Boniface came to observe the proceedings before Judge Bell that afternoon.  Boniface sought permission from Judge Bell to speak on Mersier's behalf and accused Viliena of abusing his authority by assaulting Mersier.  Angered by Boniface's statements, Viliena stormed out.  During his absence, Judge Bell advised Boniface to leave, warning that his safety could be at risk upon Viliena's return.

32.    Boniface turned to leave and found himself face-to-face with Viliena and members of the KOREGA militia, including Hautefort Bajon and Meritus Beaublanc, members of Viliena's mayoral staff, and Jean-Louis Bell and Beniçoit Bell, cousins of Judge Bell.  Jean-Louis Bell tried to slap Boniface, and Boniface raised his arm to block the blow.  Viliena and the other KOREGA members surrounded Boniface and threatened him with violence.  A group of bystanders, including several parents of Boniface's grade school students, intervened to help Boniface and escorted him away to Plaintiff Martyr's home.

33.    Viliena and the KOREGA members followed Boniface to Martyr's home.  They continued to threaten and attempt to hit Boniface until Viliena instructed his associates to let him go because they would "take care of him later."  Viliena returned to Judge Bell's residence to follow up on Mersier's arrest.  Boniface returned to his home, thinking that the altercation was over.

34.    That evening, Viliena and an associate from the KOREGA militia appeared near Boniface's home.  They ordered the residents in the area to remain behind closed doors and announced that later that night, the *chimères* (Creole slang for paramilitaries) would appear and show no mercy.

35.    Later, Viliena led a group of approximately twelve men from the KOREGA militia, armed with firearms, machetes, clubs, and picks, to Boniface's home.  The group

included members of the mayoral staff, including Hautefort Bajon, Pierrot Boileau, and Meritus Beaublanc, and other members of the KOREGA militia, including Villeme Duclona; Michelet Noel; Jean Pierre Gardy; Lifaite Livert; Lissage Viliena, Defendant Viliena's father; and Jean-Louis Bell and Beniçoit Bell, cousins of Judge Bell.

36.     David Boniface was not at home at the time; he had gone to church.  His younger brother, 23-year-old Eclesiaste Boniface, answered the door, unaware of Viliena's intentions.  Mayor Viliena personally supervised as his associates dragged Eclesiaste into a crowd of about thirty bystanders.  Eclesiaste pleaded with the crowd, saying that he was uninvolved and had no problems with anybody.  Viliena rejected his pleas.  Viliena's associates lunged at Eclesiaste with a machete.  One of Viliena's associates fired his gun, killing Eclesiaste.  As Eclesiaste's body lay on the ground, one of Viliena's associates smashed his head with a large rock.

37.     Eclesiaste was unarmed at the time and did not pose a real or apparent threat to persons or property.  Moreover, Eclesiaste was never charged with, convicted of, or sentenced for any crime punishable by execution.  Indeed, the Republic of Haiti abolished the death penalty pursuant to the Decree of July 4, 1988.

38.     Neighbors ran to David Boniface's church to warn him that Eclesiaste had been killed and that Viliena and the KOREGA militia were now looking for him.  The church pastor sheltered Boniface overnight.

39.     The next morning, Boniface and his family found Eclesiaste's mangled body still lying in the street and filed a complaint with Judge Saint Bell, who visited the crime scene.  After Judge Bell departed, Boniface, with neighbors, carried Eclesiaste's body to the Mayor's office in protest.  Viliena ordered Boniface to remove the body.  When he refused, a police officer struck Boniface with the butt of a rifle.  Boniface and his neighbors eventually carried away Eclesiaste's body and prepared it for burial.

**The Raid on the Community Radio Station: Torture and Attempted Extrajudicial Killing of Nissage Martyr and Juders Ysemé (April 8, 2008)**

40.     In or around March 2008, a committee of local journalists and activists founded a community radio station in Les Irois, called New Vision Radio (the "radio station").   Radio occupies a central place in Haitian culture.   With high rates of illiteracy in Haiti, radio serves as the primary source of news for much of the country.   As the first local radio station in the remote town of Les Irois, New Vision Radio became the source of great excitement and pride within the community. At the time, there were no newspapers or public Internet access in Les Irois, and radio was the sole means of mass communication.   Ultimately, the station hoped to open the first ever Internet café in Les Irois, to serve the entire community.   The radio station was financed and operated with support from two Struggling People's Party politicians, Senator Andris Riché and Deputy Orelien Joachim.   The radio station rented a room from Plaintiff Nissage Martyr, and operated out of his home.   It was not yet operational at the time of the April 2008 attack. Throughout March and early April 2008, station volunteers ran test broadcasts, consisting of evangelical and other music, to determine the reach of the signal.

41.     Viliena opposed the radio station from its inception.   The day the radio station launched in later March 2008, Deputy Joachim called during a live broadcast and proposed on air that he and Viliena might each purchase a telephone line for the station, so that more listeners could call in.   Viliena also called in to the broadcast and rejected the Deputy's proposal, declaring his intent to shut down the radio station.   Community members took to their phones, calling into the station and asking how they might help keep it running.   Around the same time, Viliena's staff member, Pierrot Boileau, gathered with other KOREGA members on the street and shouted that they wanted to shut down the radio station.

42.     On or about March 27, 2008, a group of government officials visited Les Irois to mediate the dispute between Viliena and supporters of the radio station.   The delegation included Deputy Joachim; the prosecutor of Jeremie, a neighboring city; as well as Haitian National Police and U.N. Mission officers.   Roughly 80 community members attended and voiced support

for the station.  After the meeting, Viliena and the delegation toured the radio station in Martyr's home. Viliena inspected the radio equipment and replied "no problem" when the prosecutor instructed him not to shut the radio station down.

43.    However, on or about April 8, 2008, Viliena mobilized members of his mayoral staff and the KOREGA militia to forcibly shut down the radio station and seize its broadcasting equipment.  In the early afternoon, Viliena parked his motorcycle near Plaintiff Nissage Martyr's residence on Pont-Pigy Boulevard in Les Irois, and met with a group of approximately 30 KOREGA militia members.   The group included, among others, Hautefort Bajon, Pierrot Boileau, Meritus Beaublanc, Lissage Viliena, Villeme Duclona, Michelet Noel, Jean Pierre Gardy, Lifaite Livert, Beniçoit Bell, Mones Dorcena, Keleman, Alan Duclona, France Isme, Martyr Kenson, Aguenel Jean, Esto Bell, and Jean-Louis Bell.  Viliena distributed firearms to the KOREGA militia members, some of whom also carried machetes, picks, and sledge hammers. Viliena handed a 12-gauge shotgun to Villeme Duclona and kept a 9mm handgun for himself.

44.    Viliena's associates started firing in the air as they walked toward the radio station.  Plaintiffs Martyr and Ysemé were sitting on the front porch of Martyr's home.  Hearing the gunshots, Ysemé ran through Martyr's home to the backyard.  Martyr started to get up from the porch to go inside, seeking to protect his wife and daughters who remained inside.

45.    As Martyr approached the front door, Viliena grabbed him and dragged him down the hallway.  Viliena pointed his 9mm handgun at Martyr's ear and told him to leave the house. Martyr refused to leave because his family remained in the house.  Viliena shouted that Martyr wanted to stay so that he could report the attack.

46.    Viliena then swept Martyr's feet out from under him, forcing him to the floor. Viliena started beating Martyr on his sides and chest, pistol-whipping Martyr with his gun and striking him with his fists.  Several members of the KOREGA militia and Mayor Viliena's staff joined in the assault, including Villeme Duclona, Michelet Noel, and Meritus Beaublanc. Viliena struck Martyr hard in the chest, causing Martyr to collapse face forward.  The militia

members left Martyr on the floor and, under Viliena's orders, carried the broadcasting equipment out the door.

47.     Meanwhile, KOREGA member Aguenel Jean spotted Plaintiff Ysemé in the backyard.  Accusing Ysemé of wanting to report the attack as well, Aguenel grabbed Ysemé and dragged him into the house.  Aguenel restrained Ysemé as Lissage Viliena, Jean Pierre Gardy, and Pierrot Boileau beat him on his head and the sides of his body.  Jean Morose Viliena, who was striking Martyr, turned to Ysemé and said that he "wanted him."

48.     Martyr was on the floor, in pain but still alive.  Martyr noticed that the KOREGA militia members had left the front door open and he made a run for the doorway to escape. Ysemé, who had managed to slip free, followed him and ran toward the door.  Some of Viliena's associates tackled Martyr as he tried to run.  Ysemé ran past him, onto the street.  Martyr broke free again and followed Ysemé onto the street.  Seeing them try to escape, Viliena ordered Villeme Duclona to shoot and kill Martyr and Ysemé.  Duclona took aim with his 12-gauge shotgun and opened fire, hitting Martyr in the leg and Ysemé in the face.  Viliena and the KOREGA militia members then seized the rest of the radio equipment and fled the scene.  They left Martyr and Ysemé for dead.

49.     At the time that Viliena ordered Duclona to open fire on Martyr and Ysemé, neither victim was engaged in any real or apparent threat to persons or property.  Moreover, neither Martyr nor Ysemé had been charged with, convicted of, or sentenced for any crime punishable by execution.  Indeed, the Republic of Haiti abolished the death penalty pursuant to the Decree of July 4, 1988.

50.     After the attack, Martyr spent several months at Saint Antoine hospital in the city of Jeremie and an additional several months at a hospital in the city of Les Cayes as a result of his wounds.  The doctors were forced to amputate his injured leg above the knee.

51.     Ysemé also required months of intensive medical treatment, including two surgeries to extract shotgun pellets from his face.  He is permanently blind in one eye and still

has pieces of shotgun pellets in his scalp and arms.  He continues to suffer from dizziness and migraine headaches as a result of his injuries.

## The Arson of 36 Homes of Perceived Political Opponents, Including Those of Plaintiffs
## (October 29, 2009)

52.     In or around January 2009, Viliena fled to the United States after Haitian authorities launched a criminal investigation into the killing of Eclesiaste Boniface and the attack on the radio station (*see below* at ¶61).  On information and belief, throughout 2009, Viliena continued to serve as mayor of Les Irois and exercise control over the KOREGA militia from his base in Massachusetts.  From the United States, Viliena worked closely with his associates in Les Irois to coordinate and implement the continued repression of perceived political opponents in Les Irois, including by targeting Plaintiffs and other residents for their participation in the criminal investigation against him and his associates. Viliena also made trips to Haiti from his residence in Massachusetts to further support the campaign of repression in Les Irois. Following his visits to Haiti, Viliena returned to the United States where he continued to manage the unlawful acts of his local associates in Les Irois. Among the most notorious of these acts of repression was the mass torching by Viliena's associates of 36 homes in Les Irois, including Plaintiffs', belonging to perceived political opponents in October 2009.

53.     In or around October 2009, Hautefort Bajon, Viliena's Chief of Staff, fell ill and returned from Port-au-Prince to Les Irois.  On October 27, 2009, KOREGA supporters, led by Defendant Viliena, who was then in Haiti, marched through the streets of Les Irois, threatening to kill people and burn down houses if Bajon died.  Viliena publicly declared that the Struggling People's Party had placed a voodoo curse on Bajon.

54.     The next day, on October 28, 2009, Viliena led his associates in the KOREGA militia, including Meritus Beaublanc, Lifaite Livert, Michelet Noel, Villleme Duclona, Alan Duclona, Marc Arthur Conte, and Jimmy Antoine, through the streets of Les Irois.  Viliena's associates carried ropes and sticks.  Accusing Struggling People's Party members of putting a curse on Bajon, Viliena's associates kidnapped two Struggling People's Party members, bound

them with ropes and paraded them down the street, beating them as they walked.   One of Viliena's associates later cut off the right ear of one of the hostages.

55.   Bajon died the following day on October 29, 2009.   Shortly thereafter, Viliena stormed into the town market with several KOREGA associates and started to strike perceived supporters of the Struggling People's Party, accusing them of causing Bajon's death.   Later that same night, members of the KOREGA militia and mayoral staff, acting in concert with Viliena, committed an arson rampage targeting 36 homes, all belonging to Struggling People's Party supporters, to avenge the death of Bajon.

56.   On the evening of October 29, 2009, Plaintiff Juders Ysemé observed a large group of men approach his residence on Pont-Pigy Boulevard in Les Irois.   The group included Beniçoit Bell, Jean Louis Bell, Marc Arthur Conte, Villeme Duclona, Alan Duclona, Lifaite Livert, Meritus Beaublanc, Lissage Viliena—Defendant Viliena's father—and other members of the KOREGA militia and mayoral staff. While they burned down houses, the group chanted: "Soldiers, attack! No mother, no father: whoever dies, so what!" Ysemé hid in a nearby banana tree garden and watched as the group poured containers of gasoline onto his house and lit it on fire.

57.   Later that night, Plaintiff Nissage Martyr was hiding in his banana tree garden near his residence on Pont-Pigy Boulevard when members of the KOREGA militia and mayoral staff approached his house.   The group included, among others, Lissage Viliena, Michelet Noel, Lifaite Livert, Keleman, Pierrot Boileau, Meritus Beaublanc, Villeme Duclona, Beniçoit Bell, and Jean Louis Bell.   From his hiding spot, Martyr could hear Lissage Viliena say that he was speaking with his son, Defendant Viliena, on a mobile phone. Lissage called out that Viliena wanted to know which homes the group was burning. Viliena's associates poured containers of gasoline into Martyr's residence, and Villeme Duclona lit a match to set it on fire.   Martyr remained hidden in the banana grove as he watched his home burn down.

58.     The homes of Nissage Martyr, Juders Ysemé, and the Boniface family were burned in the arson spree and rendered uninhabitable.  In all, the arson of 36 homes left at least 40 families and 300 individuals in Les Irois homeless.

### Viliena's Flight From Justice to the United States and Continued Impunity in Haiti

59.     Plaintiffs Boniface, Martyr, and Ysemé diligently pursued all avenues for justice within Haiti, without avail.  Since 2007, they have lodged at least eight reports or complaints regarding the acts alleged herein with Haitian law enforcement and judicial authorities, the U.N. Mission in Haiti, and the Inter-American Commission on Human Rights.  To date, Viliena has not been held to account.

60.     In response to Plaintiffs' complaints, the Haitian judiciary initially pursued a criminal investigation of human rights abuses committed by Viliena and his associates.  In September 2008, a Haitian investigating judge ordered Viliena's arrest.  However, Viliena was provisionally released in December 2008 as a result of political pressure.

61.     Viliena and his associates sought to avoid the criminal investigation by fleeing the jurisdiction.  In or around January 2009, during his provisional release from jail, Viliena fled Haiti to Massachusetts, where he continues to reside. Several other members of the KOREGA militia also fled or went into hiding.

62.     In 2010, Viliena and 19 members of the KOREGA militia were indicted in Haiti for their involvement in the killing of Eclesiaste, maiming of Martyr and Ysemé, and ransacking of the radio station.  The indictment stated that the "fugitives" (i.e., Viliena and other co-defendants who had fled Les Irois) would be tried "in absentia."  However, Viliena was never tried either in absentia or in person.

63.     From his base in Massachusetts, Viliena continues to persecute Plaintiffs and perceived political opponents in Les Irois.  As detailed above (see discussion *supra* ¶¶ 52-58), in October 2009, members of the KOREGA militia and mayoral staff, acting in concert with Viliena, undertook an arson rampage in Les Irois burning down 36 homes, all belonging to Struggling People's Party supporters, including those of all three Plaintiffs. In a separate

incident, Clorene Francois, a neighbor of the Boniface family, was brutally beaten by members of the KOREGA militia after she was summoned to provide in-court, eyewitness testimony about the killing of Eclesiaste Boniface.

64.     Moreover, Viliena has been able to return freely to Haiti following his indictment without fear of prosecution.  Since Viliena's appointment as Interim Executive Agent in August 2012, he has flouted his impunity, warning Plaintiffs that his power and political connections place him above the law in Haiti and that it would be futile—and dangerous—for them to seek justice.

## GENERAL ALLEGATIONS

65.     Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 64 of this Complaint as if fully set forth herein.

### Liability for Ordering, Inciting, or Soliciting the Attacks on Plaintiffs

66.     Viliena ordered, incited, and/or solicited his subordinates in the KOREGA militia and mayoral staff to commit the attacks on Plaintiffs and their property in Les Irois.

67.     Viliena verbally ordered his subordinates in the KOREGA militia and mayoral staff to attack David Boniface and, in his place, kill Eclesiaste Boniface on July 27, 2007, and to raid the radio station and kill Martyr and Ysemé on April 8, 2008.

68.     As Mayor of Les Irois and head of the KOREGA militia in Les Irois, Viliena exercised *de jure* authority over his mayoral staff and *de facto* authority over the KOREGA militia.  Members of the mayoral staff and KOREGA militia sought and received instructions from Viliena in committing the attacks alleged herein; they complied with Viliena's orders; and they helped carry out Viliena's political agenda.  Viliena recruited and/or solicited individuals to participate in the wrongful acts alleged herein; selected and communicated which targets to attack; supplied arms; provided logistical support; and gave orders to detain, torture, and kill victims, and to seize or destroy property.

69.     Viliena was aware of the substantial likelihood of harm in transmitting each of these orders, including by providing weapons to the perpetrators prior to ordering the attacks, and he consciously desired that his associates execute the unlawful acts.

70.     Viliena further incited or solicited the attacks against Plaintiffs and other Struggling People's Party supporters in Les Irois.  Viliena urged or encouraged the commission of these crimes by providing the perpetrators with weapons, selecting the targets, instructing the perpetrators when to attack, and providing logistical support and moral encouragement. Viliena's incitement and/or solicitation was directed to, and likely to produce, imminent unlawful action.  By virtue of his acts, Viliena was aware of the substantial likelihood of harm in instigating or inciting these attacks, and consciously desired that the unlawful attacks be executed.

71.     Viliena's ordering, incitement, and solicitation had a direct and substantial effect on the commission of the wrongful acts.  The KOREGA militia and mayoral staff complied with Viliena's commands.   For example, KOREGA militia members held back against David Boniface outside Judge Bell's chambers when Viliena said to "take care of him later"; initiated the radio station raid upon Viliena's order; shot Nissage Martyr and Juders Ysemé upon Viliena's command; and set fire to Plaintiffs' residences after Viliena rallied his supporters to avenge the death of Hautefort Bajon.

**Liability for Acts in Furtherance of a Conspiracy to Attack Plaintiffs**

72.     As detailed in the allegations above, Viliena and his associates in the mayoral staff and KOREGA militia agreed to a plan of unlawful killings, torture, arson, and intimidation as means to quash political opposition and terrorize the civilian population of Les Irois.  Viliena and his associates entered into this unlawful agreement knowing that the goal of the conspiracy was to commit attacks on persons and property in violation of customary international law and Haitian law and intending that such wrongful acts be committed.

73.     Viliena and/or his co-conspirators made overt acts in furtherance of the conspiracy, including the wrongful acts alleged herein, and directly and proximately caused the injuries, property damage, and deprivation of Plaintiffs' fundamental rights alleged herein.  Thus, in addition to being personally liable for his own actions, Viliena is jointly and severally liable for the actions of the other co-conspirators, all of which were in furtherance of the conspiracy.

74.     Viliena continued to participate in the conspiracy from within the United States. He fled to the United States in January 2009, hindering the apprehension, trial, or punishment of him and his co-conspirators in Haiti.  On information and belief, he continued to exercise control over the KOREGA militia in Les Irois from his base in Massachusetts.  While within the United States, he coordinated his return to Les Irois and the campaign of persecution against Plaintiffs and other Struggling People's Party supporters, which culminated in the arsons of October 29, 2009.

**Liability for Aiding and Abetting the Perpetrators of the Attacks on Plaintiffs**

75.     As detailed in the allegations above, Viliena aided, abetted, or otherwise substantially assisted in the commission or attempted commission of the unlawful acts alleged herein.

76.     Viliena provided practical assistance to members of the mayoral staff and KOREGA militia in Les Irois who committed the wrongful acts alleged herein—including by supplying arms, instructions, targets, logistical support, and encouraging the perpetrators of the attacks.  Such assistance had a substantial effect on the commission or attempted commission of the attacks.

77.     At all relevant times, Viliena knew and purposefully intended that his actions would aid, abet or assist in the commission of the wrongful conduct alleged herein.  Viliena is therefore jointly and severally liable for the wrongful conduct of the persons whom he aided and abetted.

## FIRST CLAIM FOR RELIEF

### Extrajudicial Killing of Eclesiaste Boniface—Plaintiff David Boniface

78.     Plaintiff David Boniface re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 77 as if fully set forth herein.

79.     The killing of Eclesiaste Boniface constitutes an extrajudicial killing in violation of the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note).

80.     Viliena purposefully and knowingly ordered, incited, solicited, conspired with, and/or aided and abetted members of the mayoral staff and KOREGA militia, to subject Eclesiaste Boniface to extrajudicial killing.

81.     Viliena's acts described herein and the acts committed by his associates against Eclesiaste Boniface were committed under actual or apparent authority, or color of law, of the Republic of Haiti by virtue of Viliena's public office as Mayor of Les Irois in July 2007.

82.     The extrajudicial killing of Eclesiaste Boniface was not authorized by any judgment pronounced by a regularly constituted court affording all the judicial guarantees that are recognized as indispensable by civilized peoples.  Eclesiaste Boniface was unarmed and did not pose a real or apparent threat to persons or property that would have justified the use of deadly force against him.  Eclesiaste Boniface was never charged with, convicted of, or sentenced for any crime punishable by execution, and the Republic of Haiti abolished the death penalty pursuant to the Decree of July 4, 1988.

83.     The extrajudicial killing of Eclesiaste Boniface was in violation of international law as reflected in international custom and in treaties binding on Haiti, including Article 6 of the International Covenant on Civil and Political Rights and Article 4 of the American Convention on Human Rights.

84.     Viliena's acts described herein, and the acts committed by his associates and co-conspirators, directly and proximately caused the extrajudicial killing of Eclesiaste Boniface and caused him to suffer severe physical and mental pain and suffering before his death.  The

extrajudicial killing of Eclesiaste Boniface also inflicted severe mental pain and suffering on Plaintiff David Boniface.

85.     Under Haitian law, Plaintiff David Boniface is heir-at-law of his brother, Eclesiaste Boniface.  David Boniface is entitled to damages in an amount to be determined at trial as a result of the extrajudicial killing described herein.

86.     Viliena's acts were deliberate, willful, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### Attempted Extrajudicial Killing—Plaintiffs Nissage Martyr and Juders Ysemé

87.     Plaintiffs Nissage Martyr and Juders Ysemé re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 86 as if fully set forth herein.

88.     The acts taken against Nissage Martyr and Juders Ysemé by Viliena and his associates during the attack of the radio station on April 8, 2008 constitute attempted extrajudicial killings in violation of the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note).

89.     Viliena is liable for the attempted extrajudicial killings of Nissage Martyr and Juders Ysemé on April 8, 2008 in that he deliberately, purposefully, and knowingly ordered, incited, solicited, conspired with, and/or aided and abetted members of the mayoral staff and KOREGA militia, to attempt to kill Nissage Martyr and Juders Ysemé—without any semblance of judicial process—by aiming and discharging a lethal firearm at them.

90.     Viliena's acts described herein and the acts committed by his subordinates against Nissage Martyr and Juders Ysemé were committed under actual or apparent authority, or color of law, of the Republic of Haiti by virtue of Viliena's public office as Mayor of Les Irois in April 2008.

91.     The attempted extrajudicial killings of Nissage Martyr and Juders Ysemé were not authorized by a judgment pronounced by a regularly constituted court affording all the judicial guarantees that are recognized as indispensable by civilized peoples.  Nissage Martyr

and Juders Ysemé were unarmed and did not pose a real or apparent threat to persons or property that would have justified the use of deadly force against them.  Moreover, Nissage Martyr and Juders Ysemé were never charged with, convicted of, or sentenced for any crime punishable by execution, and the Republic of Haiti abolished the death penalty pursuant to the Decree of July 4, 1988.

92.     The attempted extrajudicial killings of Nissage Martyr and Juders Ysemé were in violation of international law as reflected in international custom and in treaties binding on Haiti, including Articles 6 of the International Covenant on Civil and Political Rights and Article 4 of the American Convention on Human Rights.

93.     Viliena's acts and the acts committed by his associates during the attack on the radio station on April 8, 2008 directly and proximately caused Nissage Martyr and Juders Ysemé to suffer severe and ongoing physical and mental pain and suffering.  Their physical injuries are permanent.  As a direct and proximate result of Nissage Martyr's injuries, one of his legs was medically amputated and, consequently, he is no longer able to work as a farmer.  As a result of Juders Ysemé's injuries, he is permanently blind in one eye and suffers dizziness and migraine headaches.

94.     Nissage Martyr and Juders Ysemé are entitled to damages in amounts to be determined at trial as a result of the attempted extrajudicial killings described herein.

95.     Viliena's acts were deliberate, willful, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

### Torture—Plaintiffs Nissage Martyr and Juders Ysemé

96.     Plaintiffs Nissage Martyr and Juders Ysemé re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 95 as if fully set forth herein.

97.     The acts perpetrated against Nissage Martyr and Juders Ysemé by Viliena and his associates during the attack of the radio station on April 8, 2008 constitute torture in violation of

the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note).

98.     Viliena personally subjected Nissage Martyr to torture by invading his home, exercising armed custody over him, beating him with a handgun and with his fists, and then commanding his associate, Villeme Duclona, to shoot him with a shotgun.

99.     Viliena purposely and knowingly ordered, incited, solicited, conspired with, and/or aided and abetted members of the mayoral staff and KOREGA militia, to subject Nissage Martyr and Juders Ysemé to torture by capturing, beating, and shooting them.

100.     At the time these acts occurred, Nissage Martyr and Juders Ysemé were under the custody or physical control of Viliena and his associates in the KOREGA militia and mayoral staff.

101.     The acts described herein were inflicted on Nissage Martyr and Juders Ysemé deliberately and intentionally to intimidate, coerce, and silence them from reporting on the KOREGA militia's attack on the radio station, and/or to discriminate against them for their perceived criticism of Viliena or for their perceived political beliefs.

102.     Viliena's acts described herein and the acts committed by his associates against Nissage Martyr and Juders Ysemé were committed under actual or apparent authority, or color of law, of the Republic of Haiti by virtue of Viliena's public office as Mayor of Les Irois in April 2008.

103.     The torture of Nissage Martyr and Juders Ysemé did not arise from and was not inherent in or incidental to lawful sanctions.  Nissage Martyr and Juders Ysemé were never charged with, convicted of, or sentenced for any crime punishable by the acts alleged herein.

104.     Viliena's acts described herein and the acts committed by his associates directly and proximately caused the torture of Nissage Martyr and Juders Ysemé and caused them to suffer severe and ongoing physical and mental pain and suffering.  Nissage Martyr has permanently lost a leg following medical amputation and can no longer work as a farmer, and Juders Ysemé remains permanently blind in one eye and suffers dizziness and migraine

headaches.  Nissage Martyr and Juders Ysemé have also suffered prolonged mental pain and suffering as a consequence of their physical injuries and the threats of death and violence made by Viliena and members of the KOREGA militia.

105.    Nissage Martyr and Juders Ysemé are entitled to damages in amounts to be determined at trial as a result of the torture described herein.

106.    Viliena's acts were deliberate, willful, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

## Crime Against Humanity of Persecution—All Plaintiffs

107.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 106 as if fully set forth herein.

108.    The acts alleged herein constitute the crime against humanity of persecution on discriminatory grounds, a "tort . . . committed in violation of the laws of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350.  Persecution on the basis of political affiliation violates customary international law prohibiting crimes against humanity as reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

## Contextual Elements

109.    Viliena and the KOREGA militia engaged in a carefully planned and executed, widespread or systematic attack directed against the civilian population of Les Irois, namely, supporters of the Struggling People's Party.  This campaign of terror consisted of multiple incidents of organized violence, including the acts of actual and attempted extrajudicial killings, torture, battery, arsons, and threats of violence alleged herein, as well as other acts of violence and intimidation designed to repress critics and political opposition.

110.    This attack was widespread within the community of Les Irois.  Since at least 2007, Viliena and his associates have engaged in an ongoing campaign of intimidation and violence.  During this period, the Struggling People's Party documented at least 18 incidents of

23

violence against its members.  The 2009 arsons alone affected hundreds of individuals, and left at least 300 people in Les Irois homeless.

111.   This attack was also systematic—all of the acts above deliberately targeted Les Irois residents perceived to support the Struggling People's Party or their close relatives.  These acts were carefully organized and followed a common pattern:  Viliena personally selected targets for attack and communicated these targets directly or via intermediaries in the mayoral staff or KOREGA militia.  His associates executed his instructions, relying on Viliena for logistical support, planning, and coordination.

112.   This attack was directed against a civilian population.  The acts alleged herein were part of a deliberate pattern and practice of targeting perceived Struggling People's Party supporters or their close relatives.

**Predicate Act: Persecution on Political Grounds**

113.   As part of this widespread or systematic attack, Viliena and his associates subjected Plaintiffs to persecution on discriminatory grounds through a series of unlawful acts. These acts include the mass torching of 36 homes of Struggling People's Party supporters, including Plaintiffs' homes; the violent censorship of the radio station; the killing of Eclesiaste Boniface, and the attempted killing and torture of Nissage Martyr and Juders Ysemé. These acts constitute a gross denial of Plaintiffs' fundamental rights under customary international law, including the rights to (1) freedom from arbitrary deprivation of life, (2) freedom from torture, (3) the security of person, (4) freedom of expression, (5) freedom of association, and (6) the integrity of Plaintiffs' homes and means of livelihood.  Moreover, these acts were intentionally committed against Plaintiffs on discriminatory grounds, because of their actual or perceived political affiliation with the Struggling People's Party.

114.   Viliena possessed the requisite knowledge that his conduct was in furtherance of an attack on a civilian population.  As alleged herein, Viliena ordered, incited, solicited, conspired with, and/or aided and abetted members of the mayoral staff and the KOREGA militia,

to engage in a widespread or systematic attack against actual or perceived Struggling People's Party supporters in Les Irois, including the persecution of Plaintiffs on political grounds.

115.    Viliena's acts described herein, and the acts committed by his associates, directly and proximately caused Plaintiffs to suffer severe and ongoing physical and mental pain and suffering and substantial damage to their real property and means of livelihood.

116.    Plaintiffs have suffered damages in amounts to be determined at trial as a result of Viliena's crimes against humanity.

117.    Viliena's acts were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### Arson under Haitian Law—All Plaintiffs

118.    Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 117 as if fully set forth herein.

119.    As alleged herein, under orders from Viliena, his associates set fire to 36 residential homes belonging to Struggling People's Party supporters, including Plaintiffs' homes, in Les Irois on October 29, 2009.

120.    Viliena purposefully and knowingly ordered, incited, solicited, conspired with, was complicit with and/or aided and abetted members of the mayoral staff and KOREGA militia, in their commission of the arsons.

121.    Viliena is therefore liable under Articles 1 and 3 of the Haitian Code of Criminal Examination and Article 356 of the Haitian Penal Code for intentionally setting fire to "buildings…while they are inhabited or serving residential purposes."

122.    The acts of Viliena and his associates directly and proximately caused the destruction of Plaintiffs' real and personal property and caused them to suffer severe emotional distress and mental suffering.

123.    Plaintiffs are entitled to damages in amounts to be determined at trial as a result of the arsons described herein.

124.    Viliena's acts were deliberate, willful, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant and the following relief:

(a)    Compensatory damages according to proof;

(b)    Punitive and exemplary damages according to proof;

(c)    Reasonable attorneys' fees, costs, and expenses according to proof;

(d)    For injunctive relief enjoining Defendant from undertaking further actions, and from conspiring with, inciting or soliciting others, to persecute, attack and harm Plaintiffs and other supporters of the Struggling People's Party, and other civilians in Les Irois, Haiti; and

(e)    Such other and further relief as the court may deem just and proper.

A jury trial is demanded on all issues so triable.

Dated:  March 22, 2017

_____/s/ Philip A. O'Connell, Jr._____

*Attorneys for Plaintiffs David Boniface, Nissage Martyr, and Juders Ysemé*

CENTER FOR JUSTICE & ACCOUNTABILITY
Scott A. Gilmore (*pro hac vice pending*)
sgilmore@cja.org
Daniel McLaughlin (*pro hac vice pending*)
dmclaughlin@cja.org
L. Kathleen Roberts (*pro hac vice pending*)
kroberts@cja.org
One Hallidie Plaza, Suite 406
San Francisco, CA 94102
(415) 544-0444 (telephone)

DENTONS US LLP
Bonnie Lau (*pro hac vice pending*)

bonnie.lau@dentons.com
One Market Plaza, Spear Tower, 24th Floor
San Francisco, California  94105
(415) 882-5000 (telephone)

DENTONS US LLP
Philip A. O'Connell, Jr. (State Bar No. 649343)
philip.oconnelljr@dentons.com
Tony K. Lu (State Bar No. 678791)
tony.lu@dentons.com
101 Federal Street Suite 2750
Boston, Massachusetts  02110-1873
(617) 235-6802 (telephone)

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing was filed electronically, that it will be served electronically upon all parties of record who are registered CM/ECF participants via the NEF, and that paper copies will be sent to any parties indicated on the NEF as non registered participants on March 22, 2017.

/s/ Philip A. O'Connell, Jr.

Philip A. O'Connell, Jr.