UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID BONIFACE, NISSAGE MARTYR, &ast;
AND JUDERS YSEMÉ, &ast;
&ast;
Plaintiffs, &ast;
&ast;
v. &ast;     Civil Action No. 17-cv-10477-ADB
&ast;
JEAN MOROSE VILIENA, &ast;
&ast;
Defendant. &ast;
&ast;

**MEMORANDUM AND ORDER ON
MOTION TO DISMISS AND MOTION TO SUBSTITUTE PARTY**

BURROUGHS, D.J.

Plaintiffs David Boniface, Nissage Martyr, and Juders Ysemé, residents of Les Irois,

Haiti, allege that Defendant, as the mayor of Les Irois and the leader of a political party opposed

to the party that Plaintiffs support, committed human rights abuses in violation of the Alien Tort

Statute ("ATS"), 28 U.S.C. § 1350, and the Torture Victim Protection Act ("TVPA"), Pub. L.

No. 102-256, 106 Stat. 73 (1992), 28 U.S.C. § 1350 (codified at note). Now before the Court are

Defendant's motion to dismiss [ECF No. 46] and Plaintiffs' motion to substitute Nissandère

Martyr as plaintiff in place of Nissage Martyr [ECF No. 29]. For the reasons set forth below, the

motion to dismiss is granted in part and denied in part, and the motion to substitute is granted.

I.     **BACKGROUND**

The following facts are drawn from the complaint, the allegations of which are taken as

true for purposes of evaluating the motion to dismiss. Ruivo v. Wells Fargo Bank, 766 F.3d 87,

90 (1st Cir. 2014).

Defendant Jean Morose Viliena is a citizen of Haiti and a lawful permanent resident of the United States. He currently resides in or around Malden, Massachusetts, and is or was employed as a school bus driver in Massachusetts. The Plaintiffs, David Boniface, Nissage Martyr, and Juders Ysemé, are citizens of Haiti who reside (or resided) in the town of Les Irois, Haiti. Boniface and Martyr are supporters of a political party in Les Irois, the Struggling People's Party, which opposes the party with which Defendant is affiliated, the Haitian Democratic and Reform Movement ("MODEREH").

On February 29, 2004, former Haitian President Jean-Bertrand Aristide was overthrown in a violent coup d'état. The 2004 coup left a power vacuum in Haiti, and in its aftermath, a large array of political parties—at least 70 nationwide—competed for popular support. Since the 2004 coup, government institutions have remained weak and unable to reestablish the rule of law. Plaintiffs assert that the Haitian National Police is chronically undertrained and underfunded, and suffers from corruption and brutality, and that Haiti's justice system is dysfunctional, with widespread corruption, politicization, and a lack of training and resources.

Plaintiffs represent that, in the absence of stable security forces and judicial accountability, political parties and rival government officials have used informal armed groups to gain and exercise power. They assert that armed groups aligned with political parties regularly engage in violence against political opponents, journalists, and human rights advocates.

In December 2006, Defendant ran for mayor of Les Irois as a candidate for the MODEREH party. Defendant's main rival in the election was a candidate from the Struggling People's Party. Defendant won the election, and he held the office of Mayor until approximately February 2010. Plaintiffs assert that, as a candidate and as Mayor, Defendant was backed by a powerful political machine known as KOREGA, which exerts control over politics in the

southwestern region of Haiti, including Les Irois, through a system of patronage, threats, and violence. Plaintiffs assert that KOREGA engaged in voter fraud, intimidation, and violence to ensure that Defendant was elected mayor. Once Defendant was elected Mayor, Plaintiffs contend that he became the head of the Les Irois branch of KOREGA and exercised control over the KOREGA militia's operations in Les Irois, using violence to accomplish his political ends. Plaintiffs assert that the KOREGA militia operated as an extension of Mayor Viliena's office in Les Irois. At all relevant times, Defendant personally supervised his mayoral staff and security detail.

Defendant fled to the Boston area in or around January 2009 following the opening of a criminal investigation into his human rights abuses and those of his associates. Plaintiffs assert that, throughout 2009, Defendant continued to serve as mayor of Les Irois and exercise control over the KOREGA militia from Massachusetts. They further assert that Defendant continued to work closely with his associates in Les Irois to coordinate and implement the continued repression of perceived political opponents, and that Defendant made trips to Haiti in support of this goal.

On or around August 27, 2012, Defendant was appointed by former Haitian President Michel Martelly to serve as the "Interim Executive Agent" for Les Irois. Through this position, he continued to exercise the functions of Mayor of Les Irois from Massachusetts. Plaintiffs believe that his term as Interim Executive Agent expired in or around October 2015. He no longer holds public office in Haiti.

### A. Death of Eclesiaste Boniface, July 27, 2007

On the morning of July 27, 2007, Defendant was accompanying a sanitation crew through the streets of Les Irois when he got into a dispute with a resident, Ostanie Mersier, about

the disposal of garbage. After Defendant hit Mersier on the head with his gun, she left to file an incident report with the local Justice of the Peace, Judge Saint Bell, and Defendant followed her to demand her arrest.

As a trial monitor for a local human rights organization, Plaintiff Boniface came to observe the proceedings before Judge Bell. Boniface also spoke on Mersier's behalf and accused Defendant of abusing his authority by assaulting Mersier. As Boniface was leaving, he encountered Defendant, along with members of the KOREGA militia, members of the mayoral staff, and two of Judge Bell's cousins. They surrounded Boniface and threatened him with violence, but a group of bystanders intervened and escorted Boniface to Plaintiff Martyr's home. Defendant and his associates followed Boniface and continued to threaten and attempt to hit Boniface until Defendant instructed his associates to let him go, because they would "take care of him later."

That evening, Defendant and an associate from the KOREGA militia appeared near Boniface's home. They ordered the residents in the area to remain behind closed doors and announced that later that night, the paramilitaries would appear and show no mercy. Later that evening, Defendant led a group of approximately twelve men from the KOREGA militia, armed with firearms, machetes, clubs, and picks, to Boniface's home. The group included members of the mayoral staff and Judge Bell's cousins. At that time, David Boniface was not at home, but was attending church. His younger brother, 23-year-old Eclesiaste Boniface, answered the door, and Defendant personally supervised as his associates dragged Eclesiaste into a crowd of about thirty bystanders. Eclesiaste pleaded with the crowd, saying that he was uninvolved and had no problems with anyone. Despite his pleas, Defendant's associates lunged at Eclesiaste with a machete, and then one of them fired his gun, killing Eclesiaste. Neighbors ran to David

Boniface's church to warn him that Eclesiaste had been killed and that Defendant and the KOREGA militia were now looking for him. The church pastor sheltered Boniface overnight.

## B.    Assault on Martyr and Ysemé, April 8, 2008

In or around March 2008, a committee of local journalists and activists founded a community radio station in Les Irois called New Vision Radio, which was to be the first local radio station in the town. Radio serves as a primary news source in Haiti due to high rates of illiteracy. The radio station was financed and operated with support from two Struggling People's Party politicians. It rented a room from Plaintiff Martyr and operated out of his home. Throughout March and early April 2008, station volunteers ran test broadcasts to determine the reach of the signal. Plaintiff Ysemé, who was in high school at the time, enjoyed spending time at the station before and after class, though he was not employed by the station.

Defendant was opposed to the radio station, and on the day the station launched, in late March of 2008, Defendant called in to the station and declared his intent to shut the station down. On or about March 27, 2008, a group of government officials visited Les Irois to mediate the dispute between Defendant and supporters of the radio station. The delegation included the prosecutor from a neighboring city, as well as Haitian National Police and officers from the United Nations Stabilization Mission in Haiti. After the meeting, the officials instructed Defendant not to shut the radio station down, and he agreed.

On or about April 8, 2008, Defendant met a group of approximately 30 KOREGA militia members near Martyr's residence. Defendant distributed firearms to the militia members, some of whom also carried machetes, picks, and sledge hammers. Defendant's associates began firing in the air as they walked toward Martyr's house. Martyr and Ysemé were sitting on the front

porch. Hearing the gunshots, Ysemé ran through the house to the backyard. Martyr started to get up from the porch to go inside, seeking to protect his wife and daughters who were inside.

Defendant grabbed Martyr and dragged him down the hallway. Defendant pointed his handgun at Martyr's ear and told him to leave the house. Martyr refused to leave because his family remained in the house. Defendant shouted that Martyr wanted to stay so that he could report the attack. Defendant then swept Martyr's feet out from under him, forcing him to the floor. He started beating Martyr on his sides and chest, pistol-whipping Martyr with his gun and striking him with his fists. Several members of the KOREGA militia and the mayor's staff joined in the assault, Defendant struck Martyr hard in the chest, causing Martyr to collapse face forward. The militia members left Martyr on the floor and carried the broadcasting equipment out the door, at the direction of Defendant.

Meanwhile, a member of the KOREGA militia spotted Plaintiff Ysemé in the backyard. He accused Ysemé of wanting to report the attack, grabbed him, and dragged him into the house. One member of the militia restrained Ysemé as others beat him on his head and the sides of his body. Defendant, who was striking Martyr, turned to Ysemé and said that he "wanted him." While Martyr was lying on the floor in pain, he saw that the front door was open, and he ran to the doorway to escape. Ysemé, who had managed to slip free, followed him and ran toward the door. Some of Defendant's associates tackled Martyr as he tried to run. Ysemé ran past him, onto the street. Martyr broke free again and followed Ysemé onto the street. Seeing them trying to escape, Defendant ordered one of his associates, Villeme Duclona, to shoot and kill Martyr and Ysemé. Duclona opened fire with his shotgun, hitting Martyr in the leg and Ysemé in the face. Defendant and the KOREGA militia members then seized the rest of the radio equipment and fled the scene. They left Martyr and Ysemé for dead.

Martyr and Ysemé survived the attack, but both were left with severe, permanent injuries. Martyr spent several months in the hospital as a result of his wounds, and his injured leg was amputated above the knee. Ysemé also required months of intensive medical treatment, including two surgeries to extract shotgun pellets from his face. He is permanently blind in one eye and still has pieces of shotgun pellets in his scalp and arms. He continues to suffer from dizziness and migraine headaches as a result of his injuries.

### C.    Arson of 36 Homes, October 29, 2009

In or around January 2009, Defendant fled to the United States after Haitian authorities launched a criminal investigation into the killing of Eclesiaste Boniface and the attack on the radio station. Plaintiffs assert that he continued to hold the office of mayor and exercised control over the KOREGA militia from Massachusetts.

In or around October 2009, Hautefort Bajon, Defendant's Chief of Staff, fell ill. On October 27, 2009, KOREGA supporters, led by Defendant, who was then in Haiti, marched through the streets of Les Irois, threatening to kill people and burn down houses if Bajon died. Defendant publicly declared that the Struggling People's Party had placed a voodoo curse on Bajon. The next day, October 28, 2009, Defendant and members of the KOREGA militia, again marched through the streets. Bajon died on October 29. Shortly thereafter, Defendant went into the town market with several KOREGA associates and started to strike perceived supporters of the Struggling People's Party, accusing them of causing Bajon's death.

On the night of October 29, members of the KOREGA militia and mayoral staff, acting in concert with Defendant, set fire to 36 homes, all belonging to Struggling People's Party supporters, to avenge the death of Bajon. The homes of Martyr, Ysemé, and the Boniface family were burned and rendered uninhabitable.

### D.    Pursuit of Remedies in Haiti

Plaintiffs Boniface, Martyr, and Ysemé assert that they have pursued all avenues for justice in Haiti to no avail. Since 2007, although they have lodged at least eight reports or complaints with Haitian law enforcement and judicial authorities, the U.N. Mission in Haiti, and the Inter-American Commission on Human Rights, Defendant still has not been held accountable. In response to Plaintiffs' complaints, the Haitian judiciary initially pursued a criminal investigation. In September 2008, a Haitian judge ordered Defendant's arrest, but he was provisionally released in December 2008, allegedly as a result of political pressure. Defendant and other members of the KOREGA militia then fled or went into hiding.

In 2010, Defendant and 19 members of the KOREGA militia were indicted in Haiti for their involvement in the acts discussed in the Complaint. The indictment stated that the defendants would be tried in absentia, however, Defendant was never tried. Plaintiffs assert that Defendant has been able to return to Haiti without fear of prosecution.

## II.    MOTION TO DISMISS

### A.    Standard of Review

When evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) at the pleading stage, granting such a motion "is appropriate only when the facts alleged in the complaint, taken as true, do not justify the exercise of subject matter jurisdiction." Muniz-Rivera v. United States, 326 F.3d 8, 11 (1st Cir. 2003). "When a district court considers a Rule 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010). "In addition, the court may consider whatever evidence has been submitted, such as the depositions and exhibits submitted in this case." Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996). "While the

court generally may not consider materials outside the pleadings on a Rule 12(b)(6) motion, it may consider such materials on a Rule 12(b)(1) motion," and attaching exhibits to a Rule 12(b)(1) motion does not convert it to a motion for summary judgment. Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002), as corrected (May 8, 2002).

To withstand a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must allege a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Assessing the plausibility of a claim is a two-step process:

> First, the court must sift through the averments in the complaint, separating conclusory legal allegations (which may be disregarded) from allegations of fact (which must be credited). Second, the court must consider whether the winnowed residue of factual allegations gives rise to a plausible claim to relief.

Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49, 53 (1st Cir. 2013) (citation omitted). Along with all well-pleaded facts, the Court must draw all logical inferences from a complaint in favor of the plaintiff. Frappier v. Countrywide Home Loans, Inc., 750 F.3d 91, 96 (1st Cir. 2014). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Rodriguez-Reyes, 711 F.3d at 53 (quoting SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (en banc)).

"When a court is confronted with motions to dismiss under both Rules 12(b)(1) and 12(b)(6), it ordinarily ought to decide the former before broaching the latter," because "if the court lacks subject matter jurisdiction, assessment of the merits becomes a matter of purely academic interest." Deniz v. Municipality of Guaynabo, 285 F.3d 142, 149–50 (1st Cir. 2002).

## B.    Jurisdiction Under the ATS

Defendant first argues that the Court lacks jurisdiction under the ATS to adjudicate Counts I–IV, because all of the relevant conduct occurred in Haiti, not the United States. As an

initial matter, the Court notes that Counts I, II, and III assert claims under the TVPA, not the

ATS, so Defendant's argument concerning the ATS pertains only to Count IV.

The ATS provides that the "district courts shall have original jurisdiction of any civil

action by an alien for a tort only, committed in violation of the law of nations or a treaty of the

United States." 28 U.S.C. § 1350. The statute has been read to allow federal courts to "recognize

private claims under federal common law" for a "modest number of international law

violations." Sosa v. Alvarez-Machain, 542 U.S. 692, 724, 732 (2004). Five years ago, the

Supreme Court addressed the question of whether a claim brought pursuant to the ATS "may

reach conduct occurring in the territory of a foreign sovereign." Kiobel v. Royal Dutch

Petroleum Co., 569 U.S. 108, 115 (2013). Applying the "canon of statutory interpretation known

as the presumption against extraterritorial application," which provides that "when a statute gives

no clear indication of an extraterritorial application, it has none, and reflects the presumption that

United States law governs domestically but does not rule the world," the court determined that

the principles underlying the canon "constrain courts considering causes of action that may be

brought under the ATS." Id. at 115–16 (internal quotation marks and citations omitted). In

Kiobel, "all of the relevant conduct took place outside the United States," and thus the plaintiffs'

claims were barred. Id. at 124. The court recognized however, that claims could be actionable

under the ATS where they "touch and concern the territory of the United States . . . with

sufficient force to displace the presumption against extraterritorial application." Id. at 124–25.

The court has not provided further guidance on the application of the "touch and concern"

standard, although it noted that "[c]orporations are often present in many countries, and it would

reach too far to say that mere corporate presence suffices." Id. at 125.[1]

---

[1] The court has since determined that "foreign corporations may not be defendants in suits
brought under the ATS." Jesner v. Arab Bank, PLC, 138 S. Ct. 1386, 1407 (2018).

In the years since <u>Kiobel</u> was decided, courts have grappled with the meaning of the "touch and concern" standard, although the First Circuit has not yet had the opportunity to weigh in. While the inquiry is naturally fact-dependent, a few general principles have emerged. First, a court must evaluate a plaintiff's "specific claim to determine what contacts with or connections to the United States are relevant." <u>Doe v. Drummond Co.</u>, 782 F.3d 576, 597 (11th Cir. 2015). Where some relevant conduct occurs domestically, "the sufficiency question—whether the claims [touch and concern the United States] with 'sufficient force' or to the 'degree necessary' to warrant displacement—will only be answered in the affirmative if *enough* relevant conduct occurred within the United States." <u>Id.</u> This inquiry may "extend to the place of decision-making." <u>Id.</u>; <u>see also</u> <u>Al Shimari v. CACI Premier Tech., Inc.</u>, 758 F.3d 516, 530–31 (4th Cir. 2014) (claims touched and concerned U.S. with sufficient force where defendant corporation was based in U.S. hired employees who perpetrated torture, received payments based on contracts issued by U.S. government in U.S., encouraged misconduct, and attempted to cover up conduct when discovered); <u>Mujica v. AirScan Inc.</u>, 771 F.3d 580, 592 (9th Cir. 2014) (explaining that allegations that decisions furthering the conspiracy occurred in the United States were relevant to the jurisdictional inquiry, although they were too conclusory to be sufficient); <u>Nestle v. Nestle, S.A.</u>, No. CV 05-5133-SVW-MRW, 2017 WL 6059134, at *5 (C.D. Cal. Mar. 2, 2017) (explaining that presumption against extraterritoriality has been displaced "when the tortious conduct itself was planned in the United States"). In contrast, where the activity that occurred in the United States did not directly involve decision-making about the specific conduct alleged to be tortious, several courts have determined that the allegations were insufficient to satisfy the "touch and concern" standard. <u>See, e.g.</u>, <u>Drummond</u>, 782 F.3d at 599 ("mere consent" by company president in United States to murder committed abroad "is not enough"); <u>William v.</u>

AES Corp., 28 F. Supp. 3d 553, 568 (E.D. Va. 2014) (rejecting argument that activities of United States corporation that "profits from and is actively involved in the decision-making of its foreign subsidiaries" were sufficient to touch and concern United States).

The facts of Sexual Minorities Uganda v. Lively, 960 F. Supp. 2d 304 (D. Mass. 2013) ("Lively I") and Sexual Minorities Uganda v. Lively, 254 F. Supp. 3d 262 (D. Mass. 2017) ("Lively II"), appeal docketed, No. 17-1593 (1st Cir. June 14, 2017) may be the most analogous to the present case. In Lively I, decided at the motion to dismiss stage, the defendant, who lived in the United States, was accused of working with others to devise and execute a "program of persecution" aimed at individuals in Uganda based on their sexual orientation and gender identity. Lively I, 960 F. Supp. 2d at 311. The court determined that the plaintiffs had sufficiently plead a cause of action under the ATS, because the complaint alleged that "the tortious acts committed by [the defendant] took place to a substantial degree within the United States, over many years, with only infrequent actual visits to Uganda." Id. at 321. The complaint described how, after the defendant returned from Uganda, "he continued to assist, manage, and advise associates in Uganda on methods to deprive the Ugandan LGBTI community of its basic rights" from the United States. Id. at 323. The complaint described the defendant's specific activities in the United States, including publishing books describing a plan of action to repress LGBTI individuals and reviewing and advising on legislation proposed in the Ugandan Parliament. Id. at 312–14. After discovery was complete in the case, however, the court granted the defendant's motion for summary judgment, concluding that the court had no jurisdiction under the ATS to hear the plaintiff's claims. Lively II, 254 F. Supp. 3d at 270. Discovery had revealed that the only activity the defendant had engaged in within the United States was to send "sporadic emails" from the United States "offering encouragement, guidance, and advice to a

cohort of Ugandans prosecuting a campaign of repression against the LGBTI community in their country," and the court determined that these emails did not "rise to the level of 'force' sufficient to displace the presumption against extraterritorial application." Id. at 268, 270.

In this case, Defendant correctly points out that two of the three major incidents alleged in the complaint—the 2007 death of Eclesiaste Boniface and the 2008 assault of Martyr and Ysemé—occurred before Defendant allegedly fled to the United States. Thus, these incidents do not shed any light on whether the allegedly tortious conduct "touch[es] and concern[s]" the United States. Plaintiffs respond that although Defendant fled to the United States in January 2009, he continued to hold office as the mayor of Les Irois, including at the time of the October 2009 arson. The Complaint reveals, however, that Defendant was physically present in Haiti on the day of the arson, October 29, 2009, as well as the two days prior, although it contains no allegations concerning Defendant's location at the time the arson occurred. Compl. ¶¶ 53–57. The Complaint does not specifically allege that Defendant planned or orchestrated the arson while he was in the United States. It does, however, include general statements to the effect that Defendant "continued to exercise control over the KOREGA militia in Les Irois from his base in Massachusetts," and that "he coordinated his return to Les Irois and the campaign of persecution against Plaintiffs and other Struggling People's Party supporters," id. ¶ 74, but contains no detail about specific actions Defendant allegedly undertook while he was living in the United States. Plaintiffs also point to another allegation in the Complaint that "[i]n a separate incident, Clorene Francois, a neighbor of the Boniface family, was brutally beaten by members of the KOREGA militia after she was summoned to provide in-court, eyewitness testimony about the killing of Eclesiaste Boniface," id. ¶ 63. The Complaint, however, does not provide the date of this incident, although it is included in a paragraph that begins with the assertion that Defendant

continues to persecute his political opponents from Massachusetts.

Accordingly, setting aside the major incidents alleged in the Complaint, none of which sufficiently "touch and concern" the United States to alone allow the Complaint to withstand a motion to dismiss, the only remaining allegations indicating that the claims "touch and concern" the United States are that, after he fled to the United States in 2009, Defendant continued to hold office as the mayor of Les Irois, continued to exercise control over the KOREGA militia, and that from the United States, he coordinated his return to Les Irois and the campaign of persecution against his enemies. The Court concludes that these allegations are more similar to Lively II, in which the facts indicated that the defendant's involvement from the United States was limited, than Lively I, which alleged specific actions that the defendant took from the United States that could give rise to a claim under the ATS. Under the Kiobel standard, the "*claims* [must] touch and concern the territory of the United States," and do so with sufficient force to displace the presumption against extraterritorial application. Kiobel, 569 U.S. at 124–25 (emphasis added). Here, the incidents that give rise to the claims alleged in the Complaint all occurred while the Defendant was in Haiti. If the Plaintiffs could point to specific activities that Defendant engaged in while in the United States that violated international law, the analysis would be different. As it stands, however, the Complaint does not demonstrate that the Plaintiffs' ATS claims have a sufficient connection to the United States, and thus the claims are barred. As such, Count IV is dismissed.

C.     Jurisdiction Over TVPA Claims

Defendant argues that the Court also lacks jurisdiction over the claims brought pursuant to the TVPA. First, Defendant asserts that "[w]ithout subject matter jurisdiction under the ATS, the Court also lacks jurisdiction over plaintiffs' TVPA claim[s]." Chen Gang v. Zhao Zhizhen,

No. 3:04CV1146 RNC, 2013 WL 5313411, at *4 (D. Conn. Sept. 20, 2013). Defendant is correct

that the TVPA creates a cause of action, but unlike the ATS, it does not provide for federal

jurisdiction. Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir. 1995). Federal jurisdiction over TVPA

claims is conferred by both the ATS and general federal question jurisdiction pursuant to 28

U.S.C. § 1331, id., but many courts have determined that section 1331 is sufficient in and of

itself to establish federal jurisdiction over TVPA claims. See Drummond, 782 F.3d at 601 ("Our

jurisdiction to consider Plaintiffs' TVPA claims is grounded . . . in 28 U.S.C. § 1331, the general

federal question jurisdiction statute."); Haim v. Neeman, No. 12-cv-351 (JLL), 2012 WL

12905235, at *3 (D.N.J. Aug. 29, 2012) (court has jurisdiction over TVPA claims pursuant to

section 1331); Doe v. Rafael Saravia, 348 F. Supp. 2d 1112, 1118 n.2 (E.D. Cal. 2004) (same);

Xuncax v. Gramajo, 886 F. Supp. 162, 178 (D. Mass. 1995) (same).[2] Thus, in this case, the

Court may exercise jurisdiction over Plaintiffs' TVPA claims through section 1331.

Next, Defendant argues that the Supreme Court's concerns about extraterritorial

jurisdiction as expressed in Kiobel should apply equally to claims brought pursuant to the TVPA.

Defendant recognizes that, in enacting the TVPA, Congress relied on its power under Article I,

Section 8 of the U.S. Constitution to "define and punish . . . Offenses against the Law of

Nations," but he asserts that the law of nations does not permit one sovereign to exercise

territorial jurisdiction over the affairs of another sovereign. Other courts have rejected this

---

[2] Other courts have suggested that the question of "[w]hether subject matter jurisdiction for a claim asserted under the TVPA must be conferred on this Court through the [ATS] or can be based solely on 28 U.S.C. § 1331" is a "thorny issue" that has not been resolved. Arndt v. UBS AG, 342 F. Supp. 2d 132, 141 (E.D.N.Y. 2004). Defendant has not made any argument as to why section 1331 is insufficient, however, nor has Defendant cited cases explaining why the Court would not have jurisdiction under section 1331. As subject matter jurisdiction is an issue that can be raised at any time, see McBee v. Delica Co., 417 F.3d 107, 127 (1st Cir. 2005), Defendant may renew his motion for dismissal on this basis with a fully-developed argument if he believes that section 1331 is not sufficient to confer jurisdiction over the TVPA claims.

argument, and Defendant cites no legal authority that directly supports this proposition. See Drummond, 782 F.3d at 601–02 (holding that "the TVPA applies extraterritorially," and explaining that "the Act itself gives clear indication of an extraterritorial application"); Chowdhury v. Worldtel Bangl. Holding, Ltd., 746 F.3d 42, 50–51 (2d Cir. 2014) (explaining that the court "find[s] no support in Kiobel or any other authority for the proposition that the territorial constraints on common-law causes of action under the ATS apply to the statutory cause of action created by the TVPA," and after conducting separate analysis of the TVPA, "conclud[ing] that the TVPA, unlike the ATS, has extraterritorial application"). Thus, Defendant has not demonstrated that the Court lacks jurisdiction over Plaintiffs' TVPA claims.[3]

### D.    Whether Plaintiffs Have Stated a Claim Under the TVPA

Defendant also argues that Plaintiffs failed to state a claim under the TVPA because they have not demonstrated that they exhausted their available remedies in Haiti, and they have not alleged that Defendant engaged in torture or an extrajudicial killing or that he was acting on behalf of a foreign nation.

#### 1.    Exhaustion

The Court must decline to hear a claim brought pursuant to the TVPA "if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350 (codified at note). The TVPA exhaustion requirement "is an affirmative defense, requiring the defendant to bear the burden of proof," a burden which is "substantial." Jean v. Dorelien, 431 F.3d 776, 781 (11th Cir. 2005).[4] This requirement is

---

[3] Defendant also argues that, because the Court lacks jurisdiction over the ATS and TVPA claims, it cannot exercise supplemental jurisdiction over the claim for a violation of Haitian law in Count V of the Complaint. This argument is unavailing, however, because the Court has determined that it does have jurisdiction over the TVPA claims.

[4] Under the rules of civil procedure, an affirmative defense "may be raised in a motion to dismiss an action for failure to state a claim," however, "for dismissal to be allowed on the basis of an

informed by general principles of international law, which provide that:

> the respondent has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use. Once the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant.

Jean, 431 F.3d at 782 (quoting Senate Report to the TVPA, S.Rep. No. 102–249, at 9–10

(1991)). "Under both the TVPA and public international law, it is the respondent or defendant's

burden to demonstrate that plaintiffs had adequate legal remedies which they did not pursue in

the country where the alleged abuses occurred." Enahoro v. Abubakar, 408 F.3d 877, 891 (7th

Cir. 2005). "Then, if the defendant 'makes a showing of remedies abroad which have not been

exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were

ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.'" Id. (quoting

S.Rep. No. 102–249, at 10). The defendant "must prove the existence of specific domestic

remedies that should have been utilized." Id. at 892 (internal quotation marks and citation

omitted). In most instances, initiation of litigation under the TVPA "will be virtually prima facie

evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the

torture occurred." Jean, 431 F.3d at 781–82 (quoting S.Rep. No. 102–249, at 9–10). Further, "to

the extent that there is any doubt on this issue, both Congress and international tribunals have

mandated that such doubts be resolved in favor of the plaintiffs." Enahoro, 408 F.3d at 892.

Defendant points to an affidavit by Mario Joseph, a Haitian attorney who represents

---

affirmative defense, the facts establishing the defense must be clear on the face of the plaintiff's pleadings," and the complaint (along with any other documents that may be properly reviewed on a Rule 12(b)(6) motion) must "leave no doubt that the plaintiff's action is barred by the asserted defense." Blackstone Realty LLC v. F.D.I.C., 244 F.3d 193, 197 (1st Cir. 2001) (internal quotation marks and citations omitted).

Plaintiffs in their civil and criminal proceedings against Defendant in Haiti. [ECF No. 20-1]. The affidavit, which was filed by Plaintiffs, was attached to a supplemental brief that the Court ordered Plaintiffs to submit to address issues concerning Plaintiffs' standing and the substitution of another individual for deceased plaintiff Nissage Martyr. [ECF No. 20]. Its purpose was to demonstrate that Plaintiffs have standing to bring this lawsuit and that they are entitled to substitute another individual for Plaintiff Martyr. It states that "the rights of my clients, Mr. David Boniface, Mr. Nissage Martyr and Mr. Juders Yseme, to file a civil complaint against Defendant Viliena for their injuries, have been recognized in Haitian legal proceedings." [ECF No. 20-1]. It further asserts that Plaintiffs were awarded money damages in a suit against five of Defendant's associates, and that proceedings against Defendant are ongoing. Id.

When evaluating a 12(b)(6), motion, the Court "may properly consider only facts and documents that are part of or incorporated into the complaint; if matters outside the pleadings are considered, the motion must be decided under the more stringent standards applicable to a Rule 56 motion for summary judgment." Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 321 (1st Cir. 2008). The First Circuit has made an exception to this rule "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; [and] for documents sufficiently referred to in the complaint." Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp., 523 F.3d 75, 86 (1st Cir. 2008) (internal quotation marks and citation omitted). Here, the only potentially applicable exception would be for a document accepted as authentic by all parties, however, that exception only applies when the "complaint's factual allegations are expressly linked to—and admittedly dependent upon" that document. Trans-Spec Truck, 524 F.3d at 321; see also Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (complaint must "rel[y] upon" document at

issue, which then "merges into the pleadings"). The Joseph affidavit is not referenced at all in the Complaint, and was filed months after the Complaint in response to a request from the Court. The Complaint in no way relies on the affidavit, nor are the facts alleged in the Complaint linked to, or dependent on, the contents of the affidavit. Thus, it is not apparent that the Court may consider the affidavit at the motion to dismiss stage.

In general, courts have declined to consider extrinsic evidence when a defendant argues, in a motion to dismiss a claim under the TVPA, that the plaintiff has not exhausted available remedies. See In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig., 190 F. Supp. 3d 1100, 1114 (S.D. Fla. 2016) ("Because it is an affirmative defense, exhaustion of local remedies need not be pled in a complaint under the TVPA, a Plaintiff's alleged failure to exhaust local remedies would not deprive the court of subject matter jurisdiction, and the matter is not properly resolved by reference to extrinsic evidence at the motion to dismiss stage."); Jara v. Nunez, No. 6:13-cv-1426-ORL-37GJK, 2015 WL 8659954, at *2 (M.D. Fla. Dec. 14, 2015) (concluding that assessment of "[t]he truth" of defendant's exhaustion of remedies defense "is better left for resolution at the summary judgment stage"); Doe v. Drummond Co., No. 7:09-cv-01041-RDP, 2009 WL 9056091, at *17 (N.D. Ala. Nov. 9, 2009) ("[W]hether Defendants are entitled to the affirmative defense on exhaustion of remedies is not appropriate for decision on a motion to dismiss."); see also Abiola v. Abubakar, No. 02-cv-6093, 2005 WL 3050607, at *3 (N.D. Ill. Nov. 8, 2005) (concluding that evidence submitted concerning exhaustion of TVPA claims created genuine issue of material fact which could only be resolved by a hearing, not on motion for summary judgment). Accordingly, the Court concludes that it is not able to consider the Joseph affidavit in evaluating the present motion to dismiss.

Furthermore, even if the Court could consider the Joseph affidavit, it would likely not be

sufficient for Defendant to satisfy his "substantial" burden of demonstrating that Plaintiffs had failed to exhaust their available remedies in Haiti. The Complaint contains detailed allegations concerning the purported dysfunction of the Haitian justice system, including descriptions of events in which individuals were targeted with threats, violence, and death for reporting a crime or participating in court proceedings. The Complaint also asserts that Defendant exerted his political influence in Haiti to avoid accountability for his actions before fleeing to Massachusetts to escape prosecution. Courts have routinely found that threats of violent retaliation and allegations that a country's judicial system is corrupt or ineffective are sufficient to show that a plaintiff lacks effective domestic legal remedies. See Enahoro, 408 F.3d at 892 (where plaintiffs indicated that "they or their relatives were targeted by the Nigerian government as political enemies," and also that "the Nigerian judiciary was under-funded, corrupt, subject to political influence and generally unable or unwilling to compensate victims of past human rights abuses," there was "obviously nothing to be gained by filing complaints in the Nigerian courts," and thus defendant failed to meet his burden to prove that plaintiff had viable legal remedies in Nigeria); In re Chiquita Brands, 190 F. Supp. 3d at 1115 (where the plaintiffs alleged facts suggesting exhausting remedies in Colombia "would be futile because of the ongoing risk of violent retaliation against civilians, judicial officers and human rights defenders seeking redress for human rights abuses," defendants were not entitled to dismissal based on lack of exhaustion); Doe v. Drummond Co., 2009 WL 9056091, at *17 (allegation in complaint that seeking redress in Colombia would be futile due to risk of retaliation sufficient to satisfy plaintiffs' burden at motion to dismiss stage). Accordingly, Defendant has not satisfied his burden to prove that Plaintiffs failed to exhaust "adequate and available remedies" in Haiti. See 28 U.S.C. § 1350.

2.     Extrajudicial Killing

Defendant contends that Plaintiffs have not demonstrated that he can be held liable for the killing of Eclesiaste Boniface, or for the attacks on Martyr and Ysemé, under a secondary theory of liability. In particular, Defendant asserts that Plaintiffs have not pleaded sufficient facts to show that Defendant can be held liable under the command and control doctrine. Plaintiffs respond that they do not allege that Defendant is liable under the command and control doctrine, but rather, they plead direct liability as well as three other secondary forms of liability: (1) ordering, inciting, or soliciting; (2) conspiracy; and (3) aiding and abetting.

Plaintiffs are correct that "the TVPA contemplates liability against officers who do not personally execute the [alleged] torture or extrajudicial killing." Mohamad v. Palestinian Auth., 566 U.S. 449, 458 (2012). "Congress is understood to legislate against a background of common-law adjudicatory principles," id. at 457, and "since domestic law sets the standards for the TVPA, secondary or indirect theories of liability recognized by U.S. law are available for claims brought under the TVPA." Drummond, 782 F.3d at 607; see also Chowdhury, 746 F.3d at 53 (holding that an individual can be liable for torture "even if his agent administers the torture"); Aziz v. Alcolac, Inc., 658 F.3d 388, 396 (4th Cir. 2011) (acknowledging, prior to Mohamad, that "[v]irtually every court to address the issue" has recognized "secondary liability for violations of international law since the founding of the Republic" (quoting Doe v. Exxon Mobil Corp., 654 F.3d 11, 19 (D.C. Cir. 2011), vacated on other grounds, 527 F. App'x 7 (D.C. Cir. 2013))). Some courts have recognized that a claim for indirect liability under an aiding and abetting theory is cognizable under the TVPA. See Drummond, 782 F.3d at 608. But see Mastafa v. Chevron Corp., 759 F. Supp. 2d 297, 300 (S.D.N.Y. 2010), aff'd, 770 F.3d 170 (2d Cir. 2014) (interpreting language of TVPA to not permit aiding and abetting liability).

At this stage, Defendant has not asserted that he cannot be held liable either directly, or under the secondary theories of liability that Plaintiffs have advanced, and instead chose to address only the command and control doctrine, which is not relied on by Plaintiffs. Accordingly, the question of whether Plaintiffs can bring a TVPA claim based on their alternative theories of liability (ordering, inciting, or soliciting, conspiracy, and aiding and abetting) is not before the Court at this time.

Defendant also asserts that the TVPA does not contemplate liability for an "attempted" extrajudicial killing. This argument is based entirely on the text of the statute, and Defendant cites no cases to support this reading. The Court is not aware of any cases that have analyzed whether a claim for attempted extrajudicial killing is tenable under the TVPA, however, several courts have permitted such claims to proceed. See Doe v. Constant, 354 F. App'x 543, 547 (2d Cir. 2009) (affirming entry of judgment, inter alia, for attempted extrajudicial killing under the TVPA); Warfaa v. Ali, 33 F. Supp. 3d 653, 666 (E.D. Va. 2014), aff'd, 811 F.3d 653 (4th Cir. 2016) (denying motion to dismiss claims under TVPA for, inter alia, attempted extrajudicial killing); Yousuf v. Samantar, No. 1:04-cv-1360 LMB/JFA, 2012 WL 3730617, at *16 (E.D. Va. Aug. 28, 2012) (entering default judgment on claims including attempted extrajudicial killing under the TVPA). Further, the Court is not aware of any cases determining that a claim for attempted extrajudicial killing is not actionable under the TVPA. Therefore, Defendant has not demonstrated that Plaintiffs' TVPA claim for attempted extrajudicial killing should be dismissed.

3.   Torture

Defendant contends that the conduct described in the complaint is not egregious enough to satisfy the definition of torture established by the TVPA. Plaintiffs assert that the acts perpetrated against Martyr and Ysemé during the 2008 incident at Martyr's home constitute

torture.

The TVPA definition of torture, as relevant here, is:

(1) the term 'torture' means any act, directed against an individual . . . by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual . . .

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

(A) the intentional infliction or threatened infliction of severe physical pain or suffering; . . .

(C) the threat of imminent death; or

(D) the threat that another individual will imminently be subjected to death, [or] severe physical pain or suffering . . . .

28 U.S.C. § 1350 (codified at note).

The requirement that the acts in question reach a certain level of severity "is crucial to ensuring that the conduct proscribed by . . . the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes." Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 92 (D.C. Cir. 2002). "The critical issue is the degree of pain and suffering that the alleged torturer intended to, and actually did, inflict upon the victim." Id. at 93. "The more intense, lasting, or heinous the agony, the more likely it is to be torture." Id. "This understanding thus makes clear that torture does not automatically result whenever individuals in official custody are subjected even to direct physical assault." Id.

"Not *all* police brutality, not *every* instance of excessive force used against prisoners, is torture . . . ." Id. Courts have determined that mere allegations that individuals were subject to "kicking, clubbing, and beatings," without detail allowing the court to evaluate the severity of the conduct, such as the "frequency, duration, the parts of the body at which [the assaults] were aimed, and the weapons used to carry them out," are not sufficient to demonstrate that the conduct "evinced the degree of cruelty necessary to reach a level of torture." Id. at 93–94. When

something more is alleged, however, such as the threat of imminent death, courts have found that such conduct rises to the level of torture under the TVPA. See Warfaa v. Ali, 33 F. Supp. 3d 653, 657, 666 (E.D. Va. 2014), aff'd, 811 F.3d 653 (4th Cir. 2016) (plaintiff sufficiently alleged torture satisfying TVPA standard where he experienced severe beatings over the course of three months, then was shot five times and left for dead).

In this case, the acts that Plaintiffs have alleged relating to the 2008 assault of Martyr and Ysemé are sufficient to satisfy the TVPA definition of torture. Plaintiffs have described with specificity the physical attacks that they claim occurred during the incident, including that Defendant and his associates pistol-whipped Martyr, that multiple individuals beat him on his sides and chest and threw him on the floor, and that one individual restrained Ysemé while three others beat him on his head and the sides of his body. Furthermore, Plaintiffs describe how Defendant and his associates threatened Martyr and Ysemé with imminent death, first by pointing a handgun directly at Martyr's ear, and then by shooting at Martyr and Ysemé. Moreover, Plaintiffs allege that a KOREGA militia member, carrying out Defendant's orders, shot Martyr and Ysemé, injuring them sufficiently that they were left for dead. Both Martyr and Ysemé endured lengthy recoveries from the gunshot wounds, and both suffered permanent physical disfigurement. Taken together, the combination of severe beatings by multiple individuals at once, threats of imminent death, and gunshot wounds causing painful, permanent injuries are sufficient to allege torture under the TVPA. See Jaramillo v. Naranjo, No. 10-21951-CIV, 2014 WL 4898210, at *14 (S.D. Fla. Sept. 30, 2014) (determining that plaintiff sufficiently plead the elements of torture where she witnessed a relative be shot three times and bleed to death, and she was threatened with imminent death by having a gun pointed at her); Jara v. Nunez, No. 6:13-cv-1426-ORL37GJK, 2014 WL 12623015, at *3 (M.D. Fla. June 30, 2014)

(definition of torture satisfied where the defendant's subordinates "brutally beat" the plaintiff, and then the defendant played "Russian Roulette" with the plaintiff and eventually shot him in the head); Chavez v. Carranza, 413 F. Supp. 2d 891, 901 (W.D. Tenn. 2005) (plaintiff sufficiently plead torture where his "attackers forced him to the ground, stepped on him, and pointed a rifle at his back," then shot his father, causing the plaintiff to believe he would be shot next). Thus, Defendant is not entitled to dismissal on this basis.

### 4.  Whether Defendant Acted on Behalf of a Foreign Nation

To establish liability under the TVPA, Plaintiffs must demonstrate that Defendant acted "under actual or apparent authority, or color of law, of any foreign nation." 28 U.S.C. § 1350 (codified at note). "[F]or purposes of the TVPA, an individual acts under color of law . . . when he acts together with state officials or with significant state aid." Chowdhury, 746 F.3d at 52–53 (internal quotation marks and citations omitted). At least one court has determined that a mayor is a state actor. See Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1249 (11th Cir. 2005).

Here, Defendant argues that the acts attributed to Defendant in the Complaint relate more to his advocacy for a Haitian political party than to acts taken as mayor of Les Irois. He asserts that the Complaint does not allege that Defendant was acting as part of his mayoral responsibilities when he carried out the attacks at issue, and therefore he contends that Plaintiffs have not demonstrated that he was acting "under color of law" at the time of the incidents. This attempt to recast the Complaint in the light most favorable to Defendant is unavailing. The Complaint makes clear that, during each of the three incidents that are the focus of the Complaint, Defendant brought along members of his mayoral staff and instructed them to engage in violent acts. In addition, each of the incidents were related to Defendant's duties as mayor.

The July 2007 incident was apparently sparked by an altercation that occurred while Defendant was accompanying a sanitation crew. The April 2008 incident occurred after Defendant had been instructed by other government officials not to shut down the radio station, presumably in his capacity as mayor. Further, Defendant apparently desired to put an end to the radio station because he believed it threatened his political power. Finally, the October 2009 arson was prompted by the death of Defendant's chief of staff, and again, Defendant expressly targeted his political opponents. Therefore, the Complaint has sufficiently alleged that, during the incidents in question, Defendant was acting in his official capacity as mayor, and used the resources available to him through that office, to target individuals he believed to be a threat to his ability to remain in office and exert power. This is sufficient to allege that Defendant acted under the "color of law."

### E.  Abstention

Finally, Defendant makes a one-sentence argument that the Court "should abstain from this matter as an exercise of comity," without elucidating why he believes abstention is appropriate. Defendant cites Ace Arts, LLC v. Sony/ATV Music Pub., LLC, 56 F. Supp. 3d 436 (S.D.N.Y. 2014) in support of this proposition. Ace Arts explains that "'[g]enerally, concurrent jurisdiction in United States courts and the courts of a foreign sovereign does not result in conflict,' and such '[p]arallel proceedings in the same in personam claim should ordinarily be allowed to proceed simultaneously, at least until a judgment is reached in one which can be pled as res judicata the other.'" Ace Arts, 56 F. Supp. 3d 436, 444 (quoting Royal & Sun Alliance Ins. Co. of Can. v. Century Int'l Arms, Inc., 466 F.3d 88, 92 (2d Cir. 2006)). "In exceptional circumstances, however, a district court may exercise its inherent power to dismiss or stay an action based on the pendency of a related proceeding in a foreign jurisdiction." Id. (internal

quotation marks and citation omitted). "[T]he mere existence of parallel foreign proceedings does not negate" the district courts' "'virtually unflagging obligation . . . to exercise the jurisdiction given them,'" however. Id. at 445 (quoting Royal & Sun Alliance, 466 F.3d at 92). "Accordingly, a district court should not abstain in deference to a previously filed foreign proceeding under 'circumstances that routinely exist in connection with parallel litigation,' but should rather reserve abstention for situations in which 'additional circumstances . . . outweigh the district court's general obligation to exercise its jurisdiction.'" Id. (quoting Royal & Sun Alliance, 466 F.3d at 95).

Here, Defendant has not explained what "exceptional circumstances" are present that warrant abstention in this particular case, nor is the Court aware of any. It appears that there may be some parallel litigation in Haiti that has occurred or is ongoing, see supra. As Ace Arts makes clear, however, the mere existence of parallel litigation is not enough to make abstention necessary. Here, given that Defendant has not provided any reason as to why the Court should abstain, and considering the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976), the Court cannot conclude that abstention is warranted.

## III.    MOTION TO SUBSTITUTE PARTY

Plaintiff Nissage Martyr died on March 24, 2017, two days after this lawsuit was filed. Plaintiffs move to substitute Nissandère Martyr, the son of Nissage Martyr, as Plaintiff pursuant to Federal Rule of Civil Procedure 25. Under Rule 25, "[i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party." Fed. R. Civ. P. 25(a)(1). Defendant opposes the motion.

"The language of Fed. R. Civ. P. 25(a)(1) is permissive." In re Baycol Prod. Litig., 616

F.3d 778, 783 (8th Cir. 2010). "The decision whether to substitute parties lies within the discretion of the trial judge and he [or she] may refuse to substitute parties in an action even if one of the parties so moves." Id. (internal quotation marks and citation omitted). The Advisory Committee on the 1963 amendments to Rule 25 noted, however, that it "intended that motions to substitute be freely granted." Id.; see Fed. R. Civ. P. 25, advisory committee to 1963 amendment ("A motion to substitute made within the prescribed time will ordinarily be granted, but under the permissive language of the first sentence of the amended rule ('the court may order') it may be denied by the court in the exercise of a sound discretion if made long after the death . . . and circumstances have arisen rendering it unfair to allow substitution.").

### A.    Timeliness of Motion

Defendant first argues that Plaintiffs' motion to substitute is not timely. Under Rule 25, if the motion to substitute "is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed." Fed. R. Civ. P. 25(a)(1). The statement noting death "must be served on the parties as provided in Rule 5 and on nonparties as provided in Rule 4." Id. at 25(a)(3).

Defendant notes that Plaintiffs filed a Notice of Death of Nissage Martyr in this case on May 16, 2017 [ECF No. 18], and he contends that Nissandère Martyr must have known of the death by March 31, 2017, when he requested an autopsy. He asserts that, because the motion to substitute was not made within 90 days, it must be dismissed. Plaintiffs contend that the 90-day limitations period is only triggered once a notice of death identifies the representative or successor who may be substituted as a party, and the notice is properly served on the representative or successor pursuant to Fed. R. Civ. P. 4 and 5.

While courts have interpreted this aspect of Rule 25 in various ways, "six circuits have

held that the limitations period in Fed. R. Civ. P. 25(a)(1) does not begin until the decedent's representative or successor is properly served with the statement noting death." In re C.R. Stone Concrete Contractors, Inc., 462 B.R. 6, 19 (Bankr. D. Mass. 2011). The Stone court noted that one concern animating this reading of Rule 25 is that, when a plaintiff dies, it may take some time to identify and notify the rightful successor or an appropriate representative. Id. at 18. Often, a party will need to notify the court of the death to obtain extensions of deadlines or other necessary relief. Id. If such a notification triggers the clock to file a motion to substitute, however, the plaintiff could run out of time to file the motion to substitute before identifying a successor. Id. Given these circumstances, reading Rule 25 to provide that the 90-day period is only triggered when the successor is served is appropriate. Moreover, the text of the rule itself is clear: "only *service* of a statement noting death starts the limitations period under the rule." Id. at 19. But see Unicorn Tales, Inc. v. Banerjee, 138 F.3d 467, 470 (2d Cir. 1998) (holding that Rule 25 does not require the statement of death to identify the successor, and explaining that the proper remedy is to seek an extension of time until the successor can be identified). A magistrate judge in this district reached the same conclusion as Stone. See Americus Mortg. Corp. v. Mark, No. 12-cv-10158-GAO, 2013 WL 3106018, at *5 (D. Mass. June 17, 2013) (explaining that, "in addition to the requirement that a suggestion of death be filed according to Rules 4 and 5, Fed R. Civ. P., the suggestion of death must identify and serve the representative or successor who may be substituted as a party," and holding that an oral statement made in court that a party had died, without naming a representative or successor, did not trigger the 90-day period).

Here, it is apparently undisputed that Nissandère Martyr was never served with the notice of death in a manner that satisfies Rule 4, and thus the Court concludes that the 90-day period to file a motion to substitute had not yet commenced when the motion to substitute was filed.

**B.     Whether Nissandère Martyr Is Nissage Martyr's Successor**

Defendant also argues that Plaintiffs have failed to demonstrate that Nissandère Martyr is the legal successor or representative of Nissage Martyr. "[T]he proper parties for substitution are the 'successors or representatives of the deceased party,'" Americus, 2013 WL 3106018, at *13 (quoting Rende v. Kay, 415 F.2d 983, 985 (D.C. Cir. 1969), and "[t]he burden is on the moving party to demonstrate that the claims asserted survived the death of the plaintiff." Brenner v. Williams-Sonoma, Inc., No. 13-cv-10931-MLW, 2016 WL 7785456, at *3 (D. Mass. Jan. 27, 2016) (citing Stone, 462 B.R. at 20), report and recommendation adopted, No. 13-cv-10931-MLW, 2016 WL 5661987 (D. Mass. Sept. 28, 2016), appeal dismissed, 867 F.3d 294 (1st Cir. 2017). "[A] person may be a 'successor' under Rule 25(a)(1) if [he or] she is (1) the primary beneficiary of an already distributed estate; (2) named in a will as the executor of the decedent's estate, even if the will is not probated; or (3) the primary beneficiary of an unprobated intestate estate which need not be probated." In re Baycol Prod. Litig., 616 F.3d at 784–85 (citations omitted).

At the time that the briefs on this motion were filed, Plaintiffs had submitted the declaration of Mario Joseph in support of the motion to substitute. The Joseph declaration explains Haitian law concerning the survival of a decedent's legal claims, and then goes on to state that

> By operation of Haitian law, upon Mr. Nissage Martyr's death, his adult son Mr. Nissandère Martyr became his heir and successor-in-interest, with the right to assume his father's pending claims against Defendant Viliena and the right to file new criminal and civil claims for wrongful death as a partie civile.

[ECF No. 20-1 ¶ 16]. Defendant took issue with this declaration, asserting that it was not sufficient to satisfy Plaintiffs' burden of proof on this issue. Regardless of the merits of this argument, after the issue was briefed, Plaintiffs filed a supplemental document which is

apparently an order of the Massachusetts Probate and Family Court appointing Nissandère Martyr as the personal representative of Nissage Martyr for purposes of Mass. Gen. Laws ch. 190B, the Massachusetts Uniform Probate Code. [ECF No. 48-1]. Accordingly, the Court concludes that this order, in combination with the Joseph Declaration, is sufficient to demonstrate that Nissandère Martyr is the legal successor or representative of Nissage Martyr. Therefore, Plaintiffs have satisfied their burden to prove that the motion to substitute should be granted.

## IV.     CONCLUSION

Accordingly, Defendant's motion to dismiss [ECF No. 46] is <u>GRANTED</u> as to Count IV, and otherwise <u>DENIED</u>. Plaintiffs' motion to substitute [ECF No. 29] is <u>GRANTED</u>, and Nissandère Martyr is hereby substituted as plaintiff in place of Nissage Martyr.

**SO ORDERED.**

August 31, 2018                                             /s/ Allison D. Burroughs
                                                                    ALLISON D. BURROUGHS
                                                                    U.S. DISTRICT JUDGE