UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAVID BONIFACE, NISSANDÈRE MARTYR, and JUDERS YSEMÉ, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 17-cv-10477-ADB |
| | * | |
| JEAN MOROSE VILIENA, | * | |
| | * | |
| Defendant. | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Following a trial from March 13, 2023 through March 21, 2023, a jury found Defendant

Jean Morose Viliena ("Defendant" or "Viliena") liable for the extrajudicial killing of Plaintiff

David Boniface's brother, Eclesiaste Boniface; the attempted extrajudicial killing and torture of

Plaintiff Nissandère Martyr's father, Nissage Martyr; and the attempted extrajudicial killing and

torture of Plaintiff Juders Ysemè ("Ysemè," and collectively with David Boniface and

Nissandère Martyr, "Plaintiffs"). [ECF No. 250 at 2 ("Verdict"); ECF Nos. 251–255, 257–258[1]].

The jury awarded David Boniface $1.75 million to compensate for the killing of his brother,

Nissandère Martyr $1.25 million to compensate for the attempted killing and torture of his father,

Ysemè $1.5 million to compensate for his attempted killing and torture, plus a total of $11

million in punitive damages for all of the Plaintiffs. [Verdict at 3–4]. Now pending before the

Court is Viliena's motion for judgement as a matter of law under Federal Rule of Civil Procedure

---

[1] The trial transcript is docketed at ECF Nos. 251 ("Day 1"), 252 ("Day 2"), 253 ("Day 3"), 254 ("Day 4"), 255 ("Day 5"), 257 ("Day 6"), and 258 ("Day 7").

50(b) and/or for a new trial under Rule 59, and remittitur of the damages award.  [ECF No. 261].

For the reasons set forth below, Viliena's motion is <u>DENIED</u>.[2]

# I.      STANDARD OF REVIEW

"A party seeking to overturn a jury verdict faces an uphill battle."  <u>Marcano Rivera v. Turabo Med. Ctr. P'ship</u>, 415 F.3d 162, 167 (1st Cir. 2005).  "Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party."  <u>Id.</u> (quoting <u>Rivera Castillo v. Autokirey, Inc.</u>, 379 F.3d 4, 9 (1st Cir. 2004)).  In evaluating a motion for judgment as a matter of law, the Court must consider "the evidence presented to the jury, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the jury verdict."  <u>Osorio v. One World Techs. Inc.</u>, 659 F.3d 81, 84 (1st Cir. 2011) (quoting <u>Granfield v. CSX Transp., Inc.</u>, 597 F.3d 474, 482 (1st Cir. 2010)).

In contrast, the Court's power to grant a Rule 59 motion for a new trial "is much broader than its power to grant a [motion for judgment as a matter of law]."  <u>Jennings v. Jones</u>, 587 F.3d 430, 436 (1st Cir. 2009).  The Court may grant a motion for a new trial "if the verdict is against the demonstrable weight of the credible evidence," or if it "results in a blatant miscarriage of justice."  <u>Foisy v. Royal Maccabees Life Ins. Co.</u>, 356 F.3d 141, 146 (1st Cir. 2004) (quoting <u>Sanchez v. P.R. Oil Co.</u>, 37 F.3d 712, 717 (1st Cir. 1994)).  "The district court may 'independently weigh the evidence' in deciding whether to grant a new trial," <u>Cham v. Station Operators, Inc.</u>, 685 F.3d 87, 97 (1st Cir. 2012) (quoting <u>Jennings</u>, 587 F.3d at 435), and "wields 'broad legal authority' when considering a motion for a new trial . . . ."  <u>Jennings</u>, 587 F.3d at

---

[2] Because this Order resolves the motion that is the subject of Plaintiffs' request for a status conference, [ECF No. 272], that request is <u>DENIED</u> as moot.

436 (quoting de Pérez v. Hosp. del Maestro, 910 F.2d 1004, 1006 (1st Cir.1990)).  At the same

time, a "'district judge cannot displace a jury's verdict merely because [she] disagrees with it' or

because 'a contrary verdict may have been equally . . . supportable.'"  Id. (quoting Ahern v.

Scholz, 85 F.3d 774, 780 (1st Cir. 1996)).  "[W]hen an argument that the evidence was

insufficient forms the basis of a motion for new trial, the district court is generally well within

the bounds of its discretion in denying the motion using the same reasoning as in its denial of a

motion for judgment as a matter of law."  Lama v. Borras, 16 F.3d 473, 477 (1st Cir. 1994).

## II.      EVIDENCE AT TRIAL

### A.      Factual Background

In reaching its verdict, the jury could have found the following facts, based on the

evidence presented at trial.  These facts are construed in the light most favorable to the verdict.

#### 1.      Haiti Generally

On the first day of trial, Dr. Robert Earl Maguire testified as an expert regarding "the

conditions of political violence in Haiti and particularly organizations that are characterized as

community-based armed gangs, armed groups."  [Day 1 at 33:10–12].  In sum, he provided,

supported by detailed testimony, [see, e.g., id. at 39:2–50:10], the following opinions that he

summarized for the jury:

> [1] Haiti is a country that is suffering under many challenges, and primary among
> them would be extreme poverty, dysfunctional or weak organizations, particularly
> in rule of law, and . . . the use of unrestrained violence in politics is another very
> common trait in Haiti.  . . .
>
> [2] [C]ommunity-based armed groups . . . have what [he] would call a symbiotic
> relationship with a patron, or patron, usually a politician who they serve.  And when
> they serve this politician, they receive benefits in return, material and financial
> benefits and access to power.  . . .
>
> [3] [T]hese groups, these community-based armed groups, given their relationship
> with the political sponsor, they can function in their communities with impunity,
> or, in other words, they function above the arm of the law.

[Id. at 34:1–17]; see also [id. at 47:13–48:10 ("The groups aligned with a political patron, there's a package of services they can provide. . . . [T]hey may discourage, find ways of discouraging people from voting against their candidate.  This could be through means of intimidation or threats. . . . They also can use threats of violence and violence itself against voters. . . . [O]nce the patron wins [election], the groups do not stand down. . . . [T]hey're going to serve his interest . . . [,] [i]t's a symbiotic relationship.  So they want to maintain access to power and control over the limited resources, so they will continue to serve that master as he retains power and as he continues to extend his power.")].

He also testified more specifically regarding KOREGA, a group "bear[ing] all the trademarks and characteristics of [a] community-based armed group[]."  [Day 1 at 33:16–22]. KOREGA was founded in the 1980s, and since then has "affiliate[d] itself with political groups and provid[ed] them with the muscle they needed to make sure they would get power and get in office."  [Id. at 51:7–23].  KOREGA operated in Grand'Anse, Haiti, which includes the community of Les Irois.  [Id. at 50:11–51:6; Day 3 at 20:16–19].

Regarding the justice system in Haiti, another expert, Brian Concannon, opined that (1) individuals who "pursue claims against powerful people in Haiti for human rights violations . . . face a very significant risk of retributive violence," and (2) "Haiti's justice system is pervasively corrupt and subject to deep political interference."  [Day 4 at 24:22–25:5].  With respect to his first opinion, he further testified that he could not "think of anyone who has pursued a legal claim for human rights violations against a powerful person where there has not been retributive violence."  [Id. at 25:10–21].

2.   Les Irois and Viliena's Mayorship

Turning to the events relevant to this case, in the late 2000s in Grand'Anse, where Les Irois is located, see supra, there were two major political parties—the Movement for the Reform

of Haiti ("MODEREH"), and the Struggling People's Party ("SPP").[3]  [Day 1 at 52:23–53:12].

They were "highly competitive" and the competition was "hard-edged."  [Id. at 62:24–63:7].

KOREGA was "aligned" with MODEREH.  [Id. at 54:16–21].

In 2006, there was an election for mayor of Les Irois.  [Day 1 at 25:11–12].  Viliena ran

as part of the MODEREH party, [Day 2 at 15:7–9], against William Lebon of the SPP and

Renault Vaillant of the ESKANP party.  [Day 1 at 25:16–18; Day 2 at 45:12–19].  Viliena won

and became mayor.  [Day 4 at 54:7–13].

KOREGA supported Viliena in the race.  [Day 2 at 44:17–45:9].  For example, Osephita

Lebon, William Lebon's sister, [Day 3 at 14:14–16, 19:21–22], testified that "[d]uring the

election, since Viliena was campaigning, he had a group of gangs that surrounded him and that

blocked William Lebon's participation," [id. at 16:21–23].  In addition, Plaintiff Nissandère

Martyr testified that Viliena himself said he was associated with KOREGA and wore KOREGA

shirts while campaigning.  [Day 4 at 75:1–2, 78:5–15].

After the election, Viliena "became mayor with his group of gangs, they started killing

people, they beat people up."  [Day 3 at 17:2–7].  In addition, between 2007 and 2009, the time

period at issue in this case, KOREGA was "using [] method[s] such as arson and surrogate

killings and beatings and threats and intimidation."  [Day 1 at 57:1–12].

Moreover, Osephita testified, for example, that Viliena "as the mayor would do certain

things affiliated to KOREGA and KOREGA would always support him."  [Day 3 at 20:20–21:1].

KOREGA was "not in hiding," Osephita explained, "[w]hen they come, everyone could see they

[we]re members of the KOREGA team, and they accompany [Viliena]."  [Id. at 22:12–14].

---

[3] The SPP is also referred to as "OPL."  [Day 1 at 53:8–11].

Osephita identified the following individuals as having been seen wearing KOREGA clothing: Viliena, Hautefort Bajon, Pierrot Boileau, Benicoit Bell, and Jean Louis Bell.  [Id. at 27:8–13]. In addition, Nissandère Martyr identified Lifaite Livert, Villeme Duclona, Agnel Jean, Pierrot Boileau, and Meritus Beaublanc as always being "behind" Viliena wearing KOREGA shirts during the election.  [Day 4 at 78:10–22].

Once Viliena became mayor, he appointed Hautefort Bajon as the director of "Mayoral Hall."  [Day 3 at 28:15–21]; see also [Day 5 at 37:11–13].[4]  In that role, he worked in the mayor's office as general secretary and directed the city hall for Viliena.  [Day 1 at 25:3–5; Day 2 at 16:16–25].  Osephita Lebon also testified that Viliena had a "security team," which included Hautefort Bajon, Pierrot Boileau, Lifaite Livert, Benicoit Bell, Jean Louis Bell, and others.  [Day 3 at 29:4–14].  Further, Jean Denais, who lived in Les Irois during the relevant time period, testified that Viliena's "mayoral staff" included Agnel Jean, Benicoit Bell, Lifaite Livert, Michelet Noel, Meritus Beaublanc (a.k.a. Ti Amerikan), and Pierrot Boileau.  [Day 3 at 100:9–101:11]; see also [Day 5 at 38:19–23 (Viliena testifying that Meritus Beaublanc worked for him at City Hall)].  Finally, Franckel Isme testified that Maxene Vilsaint worked at the City Hall for the mayor.  [Day 4 at 51:24–25, 54:14–21].

### 3.   July 27, 2007: Eclesiaste Boniface Killing

 Plaintiff David Boniface grew up in Les Irois.  [Day 2 at 11:7–9].  In 2006, he lived there with his mother, father, brothers and sisters, including his younger brother Eclesiaste.  [Id. at 11:17–21].  Viliena was David's cousin, and he had "known him for quite some time."  [Id. at

---

[4] Osephita Lebon herself was the mayor of Les Irois for four years around 1995.  [Day 3 at 17:9–12].  She testified that the mayor of Les Irois selects their "director of City Hall," and that the mayor has authority over his team such that "[w]hat he says, tells them to do, they do."  [Id. at 18:24–19:15].

13:20–25].  In the 2006 election, David voted for Viliena's opponent, William Lebon of the SPP, but David himself was not an SPP member.  [Id. at 14:12–15:6].

David worked as a schoolteacher, but he was also taking classes about "violence, injustices, and a lot of other things, including women's rights."  [Day 2 at 12:8–20].  The classes were offered through a national network for human rights called RNDDH, and he participated from 2006–2008.  [Id. at 12:12–13:5].  Through the classes, he became a certified human rights advocate.  [Id. at 13:10–19].

On the morning of July 27, 2007, David was at home when Nissage Martyr came to him and told him there had been an argument between "Ms. Ostanie" and Viliena. [Day 2 at 15:19–16:5].  Viliena had apparently hit Ostanie in the face after she had a dispute with the sanitation department over a trash pile in front of her home.  [Day 3 at 30:11–18, 31:20–25]; see also [Day 4 at 80:6–81:9].  Nissage had come to David because he was a certified human rights advocate. [Day 2 at 16:1–5].

In Les Irois, a judge would typically help resolve disputes, and thus Viliena "arrested Ostanie and took her to [Judge Bell's] house to discuss the issue."  [Day 3 at 33:3–18].  After Nissage came to see him, David went to the judge's home, where Ostanie and Viliena were explaining the incident.  [Day 2 at 16:3–15, 17:4–13].  Osephita Lebon was present at the judge's house, [Day 3 at 33:21–22], as were Hautefort Bajon Meritus Beaublanc, Pierrot Boileau, Benicoit Bell, Jean Louis Bell, Lifaite Livert, and others, [Day 2 at 16:16–24; Day 3 at 35:3–9].

Viliena saw that David was present, and asked the judge to make David leave because he was a "certified human rights defender," and Ostanie's story had nothing to do with human rights.  [Day 2 at 17:4–16].  When he was asked to leave, David "said that everyone has rights," Bajon accused him of speaking in "harsh terms," and Viliena "stormed out."  [Id. at 17:17–18:1];

see also [Day 3 at 101:21–102:24 ("David Boniface was asking the judge if officially the mayor has the right to slap the lady.  And [Viliena] was making a lot of – he was making a lot of pressure on David Boniface.  . . . All of his partisans who were there were putting pressure.")].

After Viliena left, the judge told David to leave because "he said that [David's] life was threatened."  [Day 2 at 18:4–7].  While David was leaving, Viliena returned with "a group of people who were not there before," though Bajon was still present, and one of the members of the group, Jean Louis Bell, "started swinging at" David.  [Id. at 18:8–24].  A nearby pastor in the area then grabbed David and brought him into a church for safety.  [Id. at 19:1–7]; see also [Day 3 at 102:25–103:6 ("They were saying bad words to him.  And they threatened to beat him. Thanks to a pastor that was passing by who saw this, who saw that the men were -- threaten him and wanted to hit him, so he said to David to go away from this place.")].

David did not stay in the church long.  [Day 2 at 19:8–9].  A group of his students and their parents came to accompany him from the church, but Viliena and his group kept following David up to the house of Nissage Martyr.  [Id. at 19:8–15].  The group included Michelet Noel, Agnel Jean, Pierrot Boileau, Meritus Beaublanc, Lifaite Livert, Rolande Vilsaint, and France Ysemè.  [Day 3 at 104:1–5].  Once he got to the front of Nissage's house, "one of the partisans of Mayor" Viliena "grabbed a bicycle" and threw it at David, but a parent "caught the bicycle in midair to avoid [him] getting hit."  [Day 2 at 19:16–21].  Viliena then turned to Bajon and said, "leave him alone, we'll deal with him later."  [Id. at 19:24–20:2].[5]

Later, Viliena and "his crew," the same men that were at the judge's house, were standing outside David's home with guns, machetes, and clubs.  [Day 3 at 36:12–37:25].  Viliena himself

---

[5] Similarly, Osephita Lebon testified that she heard Viliena say to David that "[l]ater on I'm coming for you."  [Day 3 at 35:24–36:1].

had a gun, as did Hautefort.  [Id. at 37:24–38:4, 59:4–10].  They were calling for David, but were told that he was not home.  [Id. at 37:11–16].  They then asked someone to "[c]ome get something that we have brought for David[,]" Eclesiaste came outside, and he was shot.  [Id. at 38:12–25]; see also [id. at 59:11–23].

The testimony regarding the shooting was somewhat inconsistent.  Lebon testified that it was Viliena who shot Eclesiaste, and that after he was shot, Benicoit Bell picked up a cinder block and dropped it on Eclesiaste's head.  [Day 3 at 39:3–23].  In contrast, Mers Ysemè, Ysemè's father, testified that he was standing nearby and that, shortly before the shooting, Viliena told Hautefort that "[a]s we don't find David, let's shoot Eclesiaste like, in his place."  [Id. at 61:8–18]; see also [id. at 74:17–22].  Mers said that Hautefort Bajon shot Eclesiaste.  [Id. 61:16–18].

Later that night, David went to church with his mother.  [Day 2 at 20:13–21].  While he was at church, a friend came and told him that Eclesiaste had died.  [Id. at 20:24–21:1].  He couldn't leave to go home, though, because Viliena's group had "surrounded the church so they could kill [him]."  [Id. at 21:2–5].  Instead, he spent the night in the pastor's home.  [Id. at 21:6–10].

The next morning, he and Judge Bell went to David's home to start an investigation into Eclesiaste's death.  [Day 2 at 21:13–25].  After seeing Eclesiaste's body, "the population picked" the body up and, with David present, "carried it to . . . Viliena's office at the City Hall."  [Id. at 22:14–23].[6]  When they arrived, Viliena called the police "to come and evacuate" the group,

---

[6] Osephita Lebon testified that it was tradition in Les Irois for the person who killed another to bury them, and thus they had walked to city hall to "insist[]" that Viliena pay for Eclesiaste's funeral and bury him.  [Day 3 at 42:14–18, 43:19–24].

"and the police officers hit [them] with the back of their shotgun and had everybody evacuate." [Id. at 22:24–23:4].

Thereafter, David buried Eclesiaste and then left Les Irois.  [Day 2 at 23:5–14].  He left "because Viliena's father[] announced in public that they would have to kill [David] to put an end to this story."  [Id. at 23:9–14].[7]  He went back and forth to Les Irois after he left, and continued to receive threats related to his brother's death, including from Viliena.  [Id. at 29:13–31:22].  David permanently left Les Irois in 2017 to live in another city in Haiti without his wife and children.  [Id. at 31:25–33:10].

    4.    <u>April 8, 2008: The Radio Station Incident</u>

Ysemè was born and raised in Les Irois.  [Day 2 at 43:4–5].  In the 2006 election, he voted for William Lebon of the SPP party, though Ysemè was not himself a member of SPP. [Id. at 45:20–46:4].

In April of 2008, Ysemè was a student, 21 years old, and living in Les Irois.  [Day 2 at 47:3–8].  In his free time, he would go to the New Vision Radio (the "Radio Station"), [id. at 47:12–15, 18–21], which was established in Les Irois around March 2008, [Day 1 at 26:4–5].

The Radio Station, located at Nissage Martyr's house, [Day 2 at 47:16–17], was founded by Orelien Joquim, who was associated with SPP.  [Day 4 at 55:9–56:3].  Viliena had been opposed to setting it up.  [Id. at 56:10–22].  Once it was set up, its programming included political discussions that were critical of Viliena as mayor.  [Day 5 at 60:3–5].

---

[7] The statement regarding Viliena's father was admitted into evidence for the limited purpose of explaining why David left Les Irois.  [Day 2 at 24:8–17].

In late March 2008, Vilfranc Larrieux, who worked for the town, [Day 3 at 80:6–11, 81:6–8], had a meeting with Viliena where Viliena requested that the Civil Protection Agency[8] in Les Irois take over the Radio Station.  [Id. at 82:7–19]; see also [id. at 106:14–107:9].  The Civil Protection Agency declined, and Viliena suggested that if they would not do it, he would do it himself.  [Id. at 106:14–107:9].  As a proposed compromise, the Civil Protection Agency suggested Viliena either set up a radio station of his own, or set up a commission to negotiate with the existing Radio Station to find common ground.  [Id. at 82:20–83:11, 106:14–107:9].

A commission was apparently established and it called the Radio Station, which offered to have Viliena come on a show.  [Day 3 at 83:17–24].  He did, and Viliena and Orelien proceeded to have an argument on air.  [Id. at 84:4–11]; see also [id. at 106:14–107:9].[9]  In the end, Viliena said, on the air, that he would shut down or destroy the Radio Station.  [Day 2 at 48:2–8; Day 3 at 107:18–23; Day 4 at 57:2–18, 83:4–8].

On April 8, 2008, Ysemè was at the Radio Station with Nissage Martyr and his family.  [Day 2 at 48:9–14].  Around noon, Viliena and his "henchman" [sic] Maxene Vilsaint came by the radio station on a motorcycle on their way to another town.  [Id. at 48:15–21].  An hour and a half later, they came back and stood near the Radio Station with a duffle bag.  [Id. at 48:22–49:17].  There were more than 30 people with them now, including Lissage Viliena (Viliena's father), Lifaite Livert, Agnel Jean, Gardy Jean-Pierre, Pierrot Boileau, Meritus Beaublanc,

---

[8] The Civil Protection Agency was a group of about 30 individuals, who reported to Viliena as mayor, and whose purpose "was to educate the population through diverse trainings.  We hold activities, social activities, in the town, and also [sic] alert when there's a disaster, catastrophe, before, during and after."  [Day 3 at 81:6–82:4].

[9] Thereafter, Larrieux went on air and said that the Radio Station was a community station for the people, and that Viliena "had no right to take over the radio station because it was the people's radio station."  [Day 3 at 84:20–85:4].  He was beaten after making this statement.  [Id. at 85:5–86:11].

Villeme Duclona, Isme Frantz, Michelet Noel, Roland Vilsaint, and France Ysemè.  [Id. at 49:18–50:12, 51:19–21; Day 3 at 62:5–63:7, 89:7–9, 108:3–13].  Viliena started "putting his hand in the bag and he was handing, distributing" guns.  [Day 2 at 49:18–50:5; Day 4 at 63:17–64:10].  Once he was done, Viliena was armed with what looked like a handgun, Villeme Duclona was armed with a shotgun, and others had machetes, ice picks, and clubs.  [Day 2 at 50:13–51:7].  Ysemè and Nissage were unarmed.  [Id. at 51:8–11].

Viliena then "made a gesture, he said, 'guys, attack.'"  [Day 4 at 64:11–13].  He led the group toward the Radio Station, a gun was fired, and "everyone scattered around."  [Day 2 at 51:22–24, 94:17–21; Day 4 at 64:11–65:3].  They then entered the house, [Day 2 at 54:19–24], where Ysemè and Nissage were hiding.  [Id. at 55:3–14, 94:17–21].

> *a.*    *Ysemè*

Once inside, Ysemè could not see Nissage and Viliena because there was a wall between them, but he could hear them.  [Day 2 at 55:9–14, 95:7–11].  Ysemè heard Nissage screaming that he was being beaten up by Viliena, and also heard Nissage say that Viliena had "busted [Nissage's] head with [his] gun."  [Id. at 55:25–56:12].  The beating lasted more than a minute. [Id. at 56:9–12].

Viliena then discovered Ysemè, [Day 2 at 56:22–25], and he

> grabbed [Ysemè] by the collar, and he started beating [Ysemè] up[,] . . . hitting [him] all over [his] face, [his] body.  And then he dragged [Ysemè] through the hallway all the way to the porch.  . . . He said, "So this is where you're hiding so you can go and report this is who destroyed the radio?  I'm going to put a noose around your neck, and then I'm going to hang you on the public plaza."

[Id. at 56:22–57:9].[10]  Eventually Viliena "held [Ysemè's] hand and said to Lifaite, 'Restrain

Juders.  We're going to hang him on the public plaza.'"  [Id. at 57:24–58:2].

At this point, "all of [Ysemè's] bones were cracking because [he] was in pain from all the

blows from [Viliena][,] [a]nd Lifaite was holding [him] very tightly.  [He] felt like [his] bones

were breaking."  [Day 2 at 58:5–8].  Meanwhile, Villeme Duclona was "standing next to the

porch" with a shotgun.  [Id. at 58:9–24].

Lifaite let go of Ysemè so he could "take equipment" and "vandalize," at which point

Ysemè "realized that [he] was free, so [he] ran[,] . . . [a]nd while [he] was getting away . . . [he]

heard . . . Viliena's voice very forcefully sa[y] . . . 'Villeme, shoot him.  Shoot Juders.'"  [Day 2

at 58:25–59:6].  Duclona then shot Ysemè "in [his] eyes," one of which he lost, [id. at 59:7–17;

Day 3 at 9:20–22]; see also [Day 3 at 64:24–65:4], and he was also hit in his head, arm, stomach,

and abdomen, [Day 2 at 59:13–17].  At the time of trial, he still had shotgun pellets in his head

and throughout his body, was in consistent pain, and struggled to do certain types of jobs.  [Id. at

62:3–63:22].  Ysemè's father covered his medical costs, which he testified were about $16,500

Haitian dollars.  [Day 3 at 66:16–68:4].

Ysemè left Les Irois in 2017 for safety reasons, namely because he "didn't want [Viliena]

and his crew to kill him."  [Day 2 at 87:10–14].  He is unable to live with his "wife" and family

and as of the time of trial, had seen them twice since 2017.  [Id. at 87:15–20].[11]

---

[10] In addition, the jury heard testimony that around this time, "Villeme Duclona, Gardy Jean-Pierre, Lifaite Livert, Lissage Viliena, Agnel Jean, and many others" were there, and they were "vandalizing the radio station, removing all the equipment from the station."  [Day 2 at 57:14–23].

[11] On cross-examination, Ysemè testified that "I have a wife, but I'm not married."  [Day 2 at 91:10–12].

b.    *Nissage Martyr*

Nissage Martyr was also attacked and shot during the Radio Station incident.  See [Day 2 at 64:25–65:3; Day 3 at 63:24–64:3; Day 4 at 64:19–65:16].  Specifically, in addition to Viliena "bust[ing] [Nissage's] head with the butt of his weapon," [Day 2 at 64:25–65:3], Viliena told Villeme to shoot Nissage, [Day 3 at 63:24–64:4].  He did not immediately do so, so Viliena said "I ask you to shoot Nissage.  I'm here for a mission that you need to follow.  I asked you to shoot Nissage."  [Id.]; see also [Day 4 at 65:8–16].  Villeme then shot Nissage in the leg, [Day 3 at 64:5–14], which was later amputated, [Day 2 at 64:25–65:3].

Nissage Martyr died on March 24, 2017.  [Day 2 at 77:21–25; Day 4 at 87:4–7].[12]  Thereafter, Nissandère Martyr replaced Nissage as the plaintiff in this suit.  [Day 4 at 87:8–10].  After doing so, Nissandère received threats, including from Viliena himself.  [Id. at 87:11–25].  When Viliena threatened him, Villeme Duclona, Lifaite Livert, Agnel Jean, Pierrot Boileau, Meritus Beaublanc, and "many others" were with Viliena.  [Id. at 88:1–6].

5.    Criminal Proceedings in Haiti

In 2018, Viliena participated in a criminal trial in Haiti regarding the Eclesiaste Boniface killing and the attack on the Radio Station.  [Day 5 at 84:17–25].  Viliena was asked a total of ten questions at that trial, and the record was three pages long.  [Id. at 85:9–14].  Concannon reviewed the case record and, based on his review, testified that

> The questions -- there weren't many to begin with and the questions that were asked were softball questions.  He was not confronted with any facts.  There were no follow-ups, no efforts to ask him to explain anything.  And not only were they softballs, they were also irrelevant softballs.  All the questions were asked about things other than -- other than the attack on the radio station and the killing of Eclesiaste Boniface.  In fact, you know, the killing of Mr. Boniface was a big part of this case and had been processed by the justice system, you know, at this point for close to ten years.  There was not -- in the whole record of the trial, there's no -- the word "Eclesiaste" does not appear.  The word "Boniface" does not appear.  I

---

[12] Testimony did not establish that his death was related to his injuries.

don't believe the word "radio" appears either.  Juders Ysemè and Nissage Martyr, they're mentioned but there's no mention in the entire transcript of any of the details of the attacks or of any evidence that was created by the courts over a decade.

[Id. at 85:15–86:8].  After the trial, the judge decided without any reasoning that Viliena was not guilty.  [Id. at 86:9–24].  Concannon testified that, in his opinion, the result was "highly consistent with corrupt verdicts" in Haiti.  [Id. at 86:25–87:6].

**B.    Procedural History**

From March 13, 2023 through March 21, 2023, the parties presented their cases to a jury, which returned a verdict in favor of Plaintiffs on the extrajudicial killing, attempted killing, and torture claims, [Verdict at 2; ECF Nos. 251–255, 257–258], and in favor of Viliena on arson claims, [Verdict at 5].[13]  Viliena filed the instant motion for judgment as a matter of law ("JMOL") and/or a new trial, as well as remittitur, on April 18, 2023.  [ECF No. 261].  Plaintiffs opposed on May 18, 2023.  [ECF No. 269].

**III.    DISCUSSION**

**A.    Judgment as a Matter of Law**

1.    Previously Dismissed Legal Arguments

As an initial matter, Viliena raises several legal arguments that this Court has already considered and rejected at various stages of the case.  First, he argues there is no secondary liability under the Torture Victim Protection Act ("TVPA"), such that he cannot be held liable for the actions of others as an aider and abettor.  [ECF No. 262 at 2].  The Court rejected this argument in its order on Viliena's motion to dismiss, finding, for example, that (1) "the TVPA contemplates liability against officers who do not personally execute the [alleged] torture or extrajudicial killing," Boniface v. Viliena, 338 F. Supp. 3d 50, 67 (D. Mass. 2018) (quoting

_____

[13] Because the alleged arson is not at issue in this motion, the Court does not describe the facts surrounding it.

Mohamad v. Palestinian Auth., 566 U.S. 449, 458 (2012)); (2) "since domestic law sets the standards for the TVPA, secondary or indirect theories of liability recognized by U.S. law are available for claims brought under the TVPA," id. (quoting Doe v. Drummond Co., 782 F.3d 576, 607 (11th Cir. 2015)); and (3) "[s]ome courts have recognized that a claim for indirect liability under an aiding and abetting theory is cognizable under the TVPA," id. (citing Drummond, 782 F.3d at 608). Viliena provides no basis for the Court to reach a different result here, and it declines to do so.

Second, Viliena avers that the TVPA provides no remedy for attempted extrajudicial killing, arguing that "[t]he plain language of the TVPA does not contemplate an 'attempted' extrajudicial killing as a recoverable offense." [ECF No. 262 at 3 (citing Moskal v. United States, 498 U.S. 103, 108 (1990))]. The Court previously found that "several courts have permitted such claims to proceed," Boniface, 338 F. Supp. 3d at 67–68 (first citing Doe v. Constant, 354 Fed. App'x 543, 547 (2d Cir. 2009) (affirming entry of judgment, inter alia, for attempted extrajudicial killing under the TVPA); then citing Warfaa v. Ali, 33 F.Supp.3d 653, 666 (E.D. Va. 2014), aff'd, 811 F.3d 653 (4th Cir. 2016) (denying motion to dismiss claims under TVPA for, inter alia, attempted extrajudicial killing); and then citing Yousuf v. Samantar, No. 1:04-cv-1360 LMB/JFA, 2012 WL 3730617, at *16 (E.D. Va. Aug. 28, 2012) (entering default judgment on claims including attempted extrajudicial killing under the TVPA)), and noted that it was "not aware of any cases determining that a claim for attempted extrajudicial killing is not actionable under the TVPA," id. at 68. Again, Viliena has provided no reason for the Court to reach a different conclusion here, and it declines to do so.

Third, Viliena states that the Court does not have subject matter jurisdiction over the TVPA claims, and that the evidence at trial—without pointing to any specific evidence—

"confirmed the fact that the TVPA claim should be dismissed for lack of jurisdiction."  [ECF No. 262 at 9–10].  The Court previously found that it has jurisdiction, see, e.g., Boniface v. Viliena, 417 F. Supp. 3d 113, 118–22 (D. Mass. 2019); Boniface, 338 F. Supp. 3d. at 63–64, and again Viliena has provided no reason for the Court to reach a different result here.

2.     Third Party Recovery for Torture

Viliena next argues, for the first time, that the TVPA does not specifically provide for recovery by third parties (here, Nissandère Martyr) for torture.  See [ECF No. 262 at 3 (citing Doe v. Qi, 349 F. Supp. 2d 1258 (N.D. Cal. 2004))].  In response, Plaintiffs argue that Viliena waived this argument by not raising it in his Rule 50(a) motion, and that, in any event, Nissandère Martyr is not a third party, but was instead substituted as a plaintiff for his father. [ECF No. 269 at 19].  The Court agrees that Viliena waived this argument, see Correa v. Hosp. S.F., 69 F.3d 1184, 1195–96 (1st Cir. 1995) ("The suggestion that the Rule 50(a) motion preserved the defense is little short of jejune.  A motion for judgment as a matter of law made at the close of all the evidence preserves for review only those grounds specified at the time, and no others.").  The Court also notes that Nissandère is not a third/non-party, but rather a substituted party who "steps into the same position as the original party."  Carrizosa v. Chiquita Brands Int'l, 47 F.4th 1278, 1337 (11th Cir. 2022) (quoting Ransom v. Brennan, 437 F.2d 513, 516 (5th Cir. 1971)); see also Boniface, 338 F. Supp. 3d at 71–72 (substituting Nissandère Martyr as a plaintiff in place of Nissage Martyr under Federal Rule of Civil Procedure 25).  Accordingly, the Court will not grant JMOL on the basis that the TVPA does not provide for Nissandère's recovery.

3.     Control Person Liability

Viliena next argues that, with respect to the attempted killings of Ysemè and Nissage Martyr during the Radio Station incident, the evidence at trial does not support a finding that he

17

had control over the shooter, Villeme Duclona.  [ECF No. 262 at 3–4].  Specifically, he argues that

> [t]here was no testimony or evidence regarding the relationship between the Defendant and Vileme [sic] Duclona, beyond the Defendant's acknowledgment that he knew Duclona as someone who lived in Les Irois and the testimony of the Plaintiffs that Duclona was often seen in the presence of the Defendant and as such was regarded by them as part of the Defendant's "crew."

> Other than the testimony that Mr. Duclona was sometimes seen in the vicinity of the Defendant there was no evidence from which the jury could find that the Defendant had the ability to control or direct the actions of Mr. Duclona or that the Defendant otherwise took actions consistent with the requirements to establish solicitation, conspiracy or aiding and abetting liability. . . .

> There was no evidence presented to the jury from which it could reasonably find that a superior/subordinate relationship existed between the Defendant and the shooter Duclona or that the actions of Duclona resulted from any direction or order initiated by the Defendant.

[Id. at 3–5].  Even if Plaintiffs were advancing a control person theory of liability, which they are not, see [ECF No. 269 at 20–21], the Court disagrees with Defendant's characterization of the facts.  Among other things, the jury could have found the following facts supporting a finding that Duclona was a member of KOREGA and under Viliena's control when he shot Ysemè and Nissage Martyr: (1) Viliena was the mayor of Les Irois, [Day 1 at 25:11–15]; (2) KOREGA was a group "bear[ing] all the trademarks and characteristics of [a] community-based armed group[]," [id. at 33:16–22], and such groups "have . . . a symbiotic relationship with a patron, or patron, usually a politician who they serve.  And when they serve this politician, they receive benefits in return, material and financial benefits and access to power," [id. at 33:23–34:17]; (3) as the mayor, Viliena "would do certain things affiliated to KOREGA and KOREGA would always support him," [Day 3 at 20:20–21:1]; (4) Duclona was always "behind" Viliena with a KOREGA shirt during the election, [Day 4 at 78:10–22]; (5) Viliena initiated and led the attack on the Radio Station, in which Duclona participated, [Day 2 at 49:18–50:12, 51:19–24, 94:17–

21; Day 4 at 64:8–13]; (6) Viliena "forcefully" told Duclona to shoot Ysemè, which he did, [Day 2 at 58:25–59:17; Day 3 at 9:20–22]; and (7) Viliena told Duclona to shoot Nissage, and when he did not immediately do so, Viliena repeated that "I ask[ed] you to shoot Nissage.  I'm here for a mission that you need to follow.  I asked you to shoot Nissage," and then Duclona did shoot Nissage, [Day 3 at 63:24–64:14; Day 4 at 65:8–16].  Accordingly, the Court disagrees with Viliena's characterization of the facts with respect to control person liability, and declines to grant JMOL on this ground.

4. <u>Secondary Liability</u>

Viliena next argues that "[t]here were no facts presented to the jury from which it could reasonably find that he provided "knowing substantial assistance" to Villeme Duclona, or that the two of them engaged in any conspiracy.  [ECF No. 262 at 5–6].  Specifically, he argues that "Defendant had no connection to the victims, who were both unaffiliated with any political party nor advocating any political cause.  There was no evidence that either the Defendant or Duclona engaged in any planning with respect to the event," and that "[t]here was no evidence as to any of the[] elements" of a conspiracy claim, namely that

> 1. That two or more persons agreed to commit a wrongful act; 2. That Defendant Viliena joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it; and 3. That one or more of the alleged wrongful acts was committed by someone who was a member of the conspiracy and acting in furtherance of the conspiracy.

[<u>Id.</u> at 5 (citing Day 6 at 31:10–17)].

Again, the Court disagrees with Viliena's characterization of the evidence.  In addition to the facts above regarding control person liability, <u>see</u> <u>supra</u>, the jury could have found the following additional facts that would support that Viliena provided "knowing substantial assistance" to Duclona and that they engaged in planning and a conspiracy surrounding the Radio Station incident: (1) Viliena said publicly that he would shut down, or destroy, the Radio

19

Station, [Day 2 at 48:2–8; Day 3 at 107:18–23; Day 4 at 57:2–18, 83:4–14]; (2) a group of 30

individuals, including Duclona, met outside the Radio Station and Viliena provided them with

weapons, [Day 2 at 49:18–51:21]; (3) Viliena led the group into the Radio station after telling

them to "attack," [Day 2 at 51:22–24, 94:17–21; Day 4 at 64:11–65:3]; and (4) during the attack,

Viliena told Duclona to shoot Ysemè and Nissage Martyr, which he did, [Day 2 at 58:25–59:17;

Day 3 at 9:20–22, 63:24–64:4]. Accordingly, the Court declines to grant JMOL on the ground

that the facts at trial could not support a claim for secondary liability.

### 5.   Death of Eclesiaste Boniface

Viliena further argues that the jury could not have "reasonably determine[d] the identity

of the shooter" of Eclesiaste Boniface based on the evidence at trial. [ECF No. 262 at 6].

Specifically, he avers that Lebon testified that Viliena was the shooter, whereas Ysemè testified

that Bajon was the shooter. [Id.]. In response, Plaintiffs argue that "there was evidence from

which the jury could reasonably determine that Defendant was directly liable, as the shooter

himself, or that he was secondarily liable, having directed or ordered; solicited; aided and

abetted; or conspired with Hautefort to shoot Eclesiaste." [ECF No. 269 at 26]. In addition,

Plaintiffs assert that "[f]ollowing the jury's determination, it would be improper for the Court to

'resolve conflicts in the testimony or to evaluate the credibility of witnesses when ruling on a

Rule 50(b) motion.'" [Id. at 27 (quoting Rogers v. Cofield, No. 08-10684-MBB, 2011 WL

6140974, *3 (D. Mass. Dec. 8, 2011) (citing Mandel v. Boston Phoenix, Inc., 456 F.3d 198, 208

(1st Cir. 2006) (under Rule 50, courts "may not consider the credibility of witnesses, resolve

conflicts in testimony, or evaluate the weight of the evidence")))].

The Court agrees with Plaintiffs. The jury could have found Viliena responsible for

Eclesiaste's death, either as the shooter himself or as the person who ordered the shooting. See

[Day 3 at 39:3–5 (Lebon testifying the Viliena shot Eclesiaste); id. at 61:8–18 (Mers Ysemè

testifying that Viliena told Hautefort that "[a]s we don't find Davis, let's shoot Eclesiaste like, in his place.")].  Accordingly, drawing all inferences in favor of the jury verdict, the Court declines to grant JMOL on the ground that there was conflicting evidence about who shot Eclesiaste Boniface.  See Rogers, 2011 WL 6140974, *3; see also Osorio, 659 F.3d at 84 (the Court must consider "the evidence presented to the jury, and all reasonable inferences that may be drawn from such evidence, in the light most favorable to the jury verdict." (quoting Granfield, 597 F.3d at 482)).

6.   State Action

Viliena next argues that the evidence at trial does not support a finding of state action because it could not establish that there was a campaign of political dominance carried out against the opposition party SPP.  [ECF No. 262 at 6].  Rather, he argues the evidence showed that none of the Plaintiffs were members of or "had any control or dominance over" SPP, and that Viliena was "not . . . a political actor[,] but . . . a thin-skinned and petty person who had overreacted."  [Id. at 6–7].  Moreover, he avers that "[n]o jury could reasonably conclude that [he] was a state actor with respect to the actions complained of or that the acts could not have been accomplished absent the exercise of such power" because (1) "[b]oth incidents involved a mob of people"; (2)"there was no evidence presented that the assemblages were part of some state action"; and (3) "[t]here was no use of state force and no evidence whatsoever that the color of law of the Republic of Haiti played any material part."  [Id. at 8].

"[F]or purposes of the TVPA, an individual acts under color of law . . . when he acts together with state officials or with significant state aid."  Boniface, 338 F. Supp. 3d at 69 (quoting Chowdhury v. Worldtel Bangl. Holding, Ltd., 746 F.3d 42, 52–53 (2d Cir. 2014) (internal quotation marks and citations omitted)).  "At least one court has determined that a

21

mayor is a state actor."  Id. (citing Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d

1242, 1249 (11th Cir. 2005)).

In denying Defendant's motion to dismiss, the Court found the following with respect to

state action:

> during each of the three incidents that are the focus of the Complaint, Defendant
> brought along members of his mayoral staff and instructed them to engage in
> violent acts.  In addition, each of the incidents were related to Defendant's duties as
> mayor.  The July 2007 incident was apparently sparked by an altercation that
> occurred while Defendant was accompanying a sanitation crew.  The April 2008
> incident occurred after Defendant had been instructed by other government officials
> not to shut down the radio station, presumably in his capacity as mayor.  Further,
> Defendant apparently desired to put an end to the radio station because he believed
> it threatened his political power.  . . . Therefore, the Complaint has sufficiently
> alleged that, during the incidents in question, Defendant was acting in his official
> capacity as mayor, and used the resources available to him through that office, to
> target individuals he believed to be a threat to his ability to remain in office and
> exert power.  This is sufficient to allege that Defendant acted under the "color of
> law."

Boniface, 338 F. Supp. 3d at 69–70.  Evidence at trial bore these allegations out.  First, the jury

could have credited testimony that community-based armed groups, like KOREGA, [Day 1 at

33:16–22], "have . . . a symbiotic relationship with a patron, or patron, usually a politician who

they serve.  And when they serve this politician, they receive benefits in return, material and

financial benefits and access to power[,]" [id. at 33:23–34:17].  Second, the jury could have

reasonably concluded that KOREGA members included Hautefort Bajon, Benicoit Bell, Jean

Louis Bell, Lifaite Livert, Villeme Duclona, Agnel Jean, Pierrot Boileau, and Meritus Beaublanc,

and that they "served" Viliena in his capacity as mayor.  See [id.; Day 3 at 20:20–21:3 (Viliena

"as the mayor would do certain things affiliated to KOREGA and KOREGA would always

support him."), 27:8–13 (the following individuals had been seen wearing KOREGA clothing:

Viliena, Hautefort Bajon, Pierrot Boileau, Benicoit Bell, and Jean Louis Bell); Day 4 at 78:10–22

(Lifaite Livert, Villeme Duclona, Agnel Jean, Pierrot Boileau, and Meritus Beaublanc were

"behind" Viliena with KOREGA shirts during the election)].   Third, several of these individuals

were part of Viliena's actual mayoral administration.  See [Day 3 at 28:15–21 (Hautefort Bajon

was the director of "Mayor Hall"), 29:4–14 (Viliena had a "security team," which included

Hautefort Bajon, Pierrot Boileau, Lifaite Livert, Benicoit Bell, and Jean Louis Bell), 100:25–

101:11 (Viliena's "mayoral staff" included Agnel Jean, Benicoit Bell, Lifaite Livert, Michelet

Noel, Meritus Beaublanc, and Pierrot Boileau); Day 4 at 54:14–21 (Maxene Vilsaint worked at

the City Hall for the mayor)].   Fourth, these individuals were directly involved in both the July

2007 killing of Eclesiaste Boniface, see [Day 3 at 36:13–37:25 (on July 27, 2007, Viliena and

"his crew," the same men that were at the judge's house, were standing outside David's home

with guns, machetes, and clubs)]; see also [Day 2 at 16:16–21 (Hautefort Bajon and Meritus

Beaublanc were at the judge's house); Day 3 at 35:3–9 (Pierrot Boileau, Benicoit Bell, Jean

Louis Bell and Lifaite Livert went to the judge's house)], and the April 2008 Radio Station

incident, see [Day 2 at 49:8–50:12 (Maxene Vilsaint, Lifaite Livert, Agnel Jean, Gardy Jean-

Pierre, Pierrot Boileau, Meritus Beaublanc, Villeme Duclona approached the radio station with

weapons)], both of which the jury could have found that Viliena led in his capacity as mayor, see

[Day 3 at 30:11–33:18 (Viliena "arrested Ostanie and took her to [Judge Bell's] house to

discuss" an issue that arose with the sanitation department), 39:3–5 (Viliena shot Eclesiaste),

61:8–18 (Viliena ordered Hautefort to shoot Eclesiaste)]; see also [Day 4 55:9–56:3 (the Radio

Station was affiliated with SPP), 64:11-65:3 (Viliena "took the lead" and told the group to

"attack" the Radio Station), 83:4–14 (Viliena said he would destroy the Radio Station); Day 5 at

60:3–5 (the Radio Station had political discussions that were critical of Viliena as mayor)].

Finally, the jury could have found that the state's investigation and trial regarding the incidents

were perfunctory and "highly consistent with corrupt verdicts" in Haiti.  [Day 5 at 84:17–87:6].

These facts support a finding that Viliena acted under color of law as mayor of Les Irois, that he was supported by mayoral staff officials and/or affiliated groups, and that Viliena knew that, in his capacity as mayor, the state was unlikely to condemn or punish him for his actions.  Thus, the Court declines to grant JMOL on the basis that Defendant did not act under color of law.

       7.    David Boniface's Standing

Viliena argues that there is "no evidence from which a jury could reasonably find that David Boniface is a proper claimant" because "Massachusetts law does not permit recovery by siblings for wrongful death," and because state law should govern the assessment of liability under the TVPA and who is a proper plaintiff for purposes of recovery.  [ECF No. 262 at 9 (first citing Drummond, 782 F.3d at 607; and then citing Bobick v. U.S. Fid. & Guar. Co., 790 N.E.2d 653, 661 (Mass. 2003))].  Plaintiffs respond that under the TVPA, "where state law would provide no remedy, a court may apply the foreign law that would recognize the Plaintiff's claim."  [ECF No. 269 at 20 (quoting Drummond, 782 F.3d at 607)].  Thus, Plaintiffs aver, "[i]t is . . . settled that standing under the TVPA can arise from foreign or domestic law."  [Id.].  Moreover, Plaintiffs state that David has standing under Massachusetts law because he was appointed as the personal representative of Eclesiaste's estate.  [Id. at 21].

As an initial matter, standing is a question of law, not fact, and thus it was not the role of the jury to determine whether David has standing.  See Steir v. Girl Scouts of the USA, 383 F.3d 7, 15 (1st Cir. 2004) ("A district court's determination that a plaintiff lacks standing is a question of law."); Wilson v. HSBC Mortg. Servs., Inc., 744 F.3d 1, 8 (1st Cir. 2014) ("[T]he question of whether certain facts establish standing is a question of law.").  Because Defendant only argues that David is not a proper claimant under Massachusetts law, the Court addresses only that issue, and finds that he is.

The Court already addressed a similar issue with respect to Nissandère Martyr, finding the following:

> "[a] person may be a 'successor' under [Federal Rule of Civil Procedure] 25(a)(1) if [he or] she is (1) the primary beneficiary of an already distributed estate; (2) named in a will as the executor of the decedent's estate, even if the will is not probated; or (3) the primary beneficiary of an unprobated intestate estate which need not be probated." In re Baycol Prod. Litig., 616 F.3d 778, 784–85 (8th Cir. 2010) (citations omitted) . . . .
>
> Plaintiffs filed a supplemental document which is apparently an order of the Massachusetts Probate and Family Court appointing Nissandère Martyr as the personal representative of Nissage Martyr for purposes of Mass. Gen. Laws ch. 190B, the Massachusetts Uniform Probate Code. [ECF No. 48-1]. Accordingly, the Court concludes that this order, in combination with the [Mario] Joseph Declaration [that explained that Nissandère was his father's successor-in-interest], is sufficient to demonstrate that Nissandère Martyr is the legal successor or representative of Nissage Martyr. Therefore, Plaintiffs have satisfied their burden to prove that the motion to substitute should be granted.

Boniface, 338 F. Supp. 3d at 72. The Massachusetts Probate and Family Court similarly appointed David Boniface as the personal representative of Eclesiaste's estate. [ECF No. 48-2].[14] Thus, for largely the same reasons that it found that Nissandère Martyr had standing to bring claims on behalf of Nissage, the Court will not grant JMOL on the basis that David Boniface is not a proper claimant.

---

[14] Mario Joseph, an attorney who represents David Boniface and Ysemè in Haiti, [ECF No. 20-1 ¶¶ 2, 4], similarly declared that "under the Haitian law of succession, David is an heir-at-law of his deceased brother, Eclesiaste, and David is the appointed representative of his elderly father, Salvane Boniface, who is also an heir-at-law," [ECF No. 20 at 9], and further that the Haitian courts have allowed David to pursue civil claims for the wrongful death of his brother, [id. at 10].

**B.    New Trial Motion**[15]

1.    Expert Testimony

Viliena firsts requests a new trial on the grounds that the jury was unfairly prejudiced by the expert testimony of Maguire and Concannon because they "had [no] particular knowledge about the venue of the facts in this matter, Les Irois, nor offered any testimony that directly related to the acts involved in this action."  [ECF No. 262 at 11].  Instead, they testified about "crime in Haiti and the offensive and insidious conduct of bad political actors," which was not enough to establish any connection between Viliena and KOREGA.  [Id.].  In sum, Viliena argues that "[t]he lengthy testimony of experts, while potentially relevant to the efficacy of the Haitian judgment in favor of the Defendant, was instead employed in a manner to characterize Haiti and Haitian politicians as universally criminal.  This unfairly, and wrongly, influenced the jury."  [Id. at 11–12].

Both Maguire and Concannon provided opinions that were supported by their expertise, see, e.g., [Day 1 at 53:20–57:12 (Maguire testifying about KOREGA's relationship with MODEREH and its operations in Les Irois and explaining the basis for his knowledge, after initial objections, for the same); Day 4 at 25:10–21 (Concannon testifying without objection regarding retributive violence in Haiti, and the basis of his knowledge for same)], and Defendant does not point the Court to any particular overruled objection at trial that would call into question the basis for the opinions they provided, see [ECF No. 262 at 10–12].  Rather, the crux of

---

[15] In addition to the arguments for a new trial addressed below, Viliena argues that "[i]n applying its own independent judgment to the question of state action and the other issues raised [in his motion for judgment as a matter of law], the Court should grant a new trial."  [ECF No. 262 at 10].  The Court denies this request for largely the same reasons explained above.  See Lama, 16 F.3d at 477 ("[W]hen an argument that the evidence was insufficient forms the basis of a motion for new trial, the district court is generally well within the bounds of its discretion in denying the motion using the same reasoning as in its denial of a motion for judgment as a matter of law.").

Defendant's argument appears to be that testimony regarding KOREGA and the political situation in Haiti was unfairly prejudicial because it was not specifically connected to Viliena or the two incidents at issue, and instead merely "characterized Haiti and Haitian politicians as universally criminal."  See [id. at 11–12].

Maguire and Concannon provided general opinions regarding, for example, "the conditions of political violence in Haiti and particularly organizations that are characterized as community-based armed gangs, armed groups," [Day 1 at 33:10–12 (Maguire)]; the fact that individuals who "pursue claims against powerful people in Haiti for human rights violations . . . face a very significant risk of retributive violence," and that "Haiti's justice system is pervasively corrupt and subject to deep political interference," [Day 4 at 24:22–25:9 (Concannon)].  Then, fact witnesses provided testimony that supported those general opinions in the context of the claims made here, including that Viliena was associated with KOREGA and KOREGA did his bidding.  See, e.g., [Day 3 at 22:12–15 (KOREGA was "not in hiding," Osephita Lebon explained, "[w]hen they come, everyone could see they [we]re members of the KOREGA team, and they accompany [Viliena].")]; see also id. at 17:2–7 (Viliena "became mayor with his group of gangs, they started killing people, they beat people up.")].

In sum, Maguire and Concannon's opinions, in combination with the fact witness' testimony, supported the jury verdict and there is nothing to suggest that their testimony resulted "in a blatant miscarriage of justice."  Foisy, 356 F.3d at 146 (quoting Sanchez, 37 F.3d at 717). Thus, the Court declines to grant a new trial based on the experts' testimony.

## 2.    Plaintiffs' Closing Argument

Viliena next argues that, during closing arguments, Plaintiffs improperly tried to rehabilitate the credibility of Ysemè with facts not in evidence.  [ECF No. 262 at 12]. Specifically, he avers that on direct examination Ysemè testified that he was married, on cross he

admitted he was not married, and then only in their rebuttal closing argument did Plaintiffs say that calling an unmarried partner one's wife is "just a cultural thing" in Haiti.  [Id.].  Viliena states that in doing so, "Plaintiffs improperly sought to supplement and correct the record by arguing facts that were not in evidence in a way that was unfair and unduly prejudicial."  [Id.].  Plaintiffs, in response, characterize Viliena's argument as an untimely objection.  [ECF No. 269 at 35].

> Sustaining an untimely objection requires Viliena to show that
>
> (1) an error was committed; (2) the error was "plain" (i.e. obvious and clear under current law); (3) the error was prejudicial (i.e. affected substantial rights); and (4) review is needed to prevent "a miscarriage of justice or [if the error has] seriously affected the fairness, integrity or public reputation of the judicial proceedings."

Granfield v. CSX Transp., Inc., 597 F.3d 474, 490–91 (1st Cir. 2010) (quoting Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 189 (1st Cir. 1996)).  Here, the Court finds that even if the rebuttal statement was improper and it was error to allow the statement to go unaddressed, the relevant testimony was very tangential to the facts at issue, and the verdict was supported by ample evidence, such that a new trial is not required to prevent a miscarriage of justice.  See Granfield, 597 F.3d at 490–91; see also Foisy, 356 F.3d at 146; cf. United States v. Taylor, 54 F.3d 967, 977 (1st Cir. 1995) (under plain error standard, "reversal is justified only if the illegitimate portion of the closing argument 'so poisoned the well that the trial's outcome was likely affected.'" (quoting United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987))).

## C.    Remittitur

Viliena finally argues that the Court should remit the damages award because, for example, "[o]ther than emotion and sympathy there was no basis whatsoever for the award of these amounts and they lack any basis in the evidence presented to the jury," "[t]he TVPA does not provide for the recovery of punitive damages," and "[t]he $11 million awarded to the

Plaintiffs in this action serves no deterrent effect, is grossly excessive and stands only as a symbolic gesture devoid of any recognizable or legitimate judicial purpose." [ECF No. 262 at 12–14].

"[A] district court has discretion to order a remittitur if such an action is warranted in light of the evidence adduced at trial." Trainor v. HEI Hosp., LLC, 699 F.3d 19, 29 (1st Cir. 2012) (citing Kelley v. Airborne Freight Corp., 140 F.3d 335, 355 (1st Cir. 1998)).  That said, "a party seeking remittitur 'bears a heavy burden,'" Currier v. United Techs. Corp, 393 F.3d 246, 256 (1st Cir. 2004) (quoting Koster v. TWA, 181 F.3d 24, 34 (1st Cir. 1999)), and "'the obstacles which stand in the path of' such claims of excessiveness 'are formidable ones,'" Trull v. Volkswagen of Am., Inc., 320 F.3d 1, 9 (1st Cir. 2002) (quoting Wagenmann v. Adams, 829 F.2d 196, 215 (1st Cir. 1987)).  Moreover, "[t]ranslating legal damage into money damages is a matter 'peculiarly within a jury's ken,' especially in cases involving intangible, non-economic losses." Travers v. Flight Servs. & Sys., Inc., 808 F.3d 525, 540 (1st Cir. 2015) (quoting Trull, 320 F.3d at 9).  "[T]he jury's assessment of damages will not be disturbed unless it is 'grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand.'"  Trull, 320 F.3d at 9 (quoting Wagenmann, 829 F.2d at 215); see also Trainor, 699 F.3d at 29 ("In exercising this discretion, the court is obliged to impose a remittitur 'only when the award exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it.'" (quoting Wortley v. Camplin, 333 F.3d 284, 297 (1st Cir. 2003) (internal quotation marks omitted)).

With respect to compensatory damages, the Court provided the following instruction, which Viliena does not take issue with in his briefing:

> Compensatory damages are the measure of the loss or injury sustained by the
> injured plaintiff, and may embrace shame, mortification, humiliation, indignity to

the feelings, and the like.  You may also award compensatory damages for pain and suffering, physical disfigurement and mental and emotional distress.  There is no exact standard for fixing the compensation to be awarded for these elements of damages.  Any award you make must be fair in light of the evidence presented at trial.

In determining the amount of compensatory damages that a plaintiff may be entitled to recover, you may consider the reasonable value of medical care incurred by the plaintiff for the treatment and cure of the injury; the plaintiff's physical mental and emotional pain and suffering to date; and reasonable probable future physical, mental, and emotional pain and suffering; any harm to plaintiff's reputation; and fair compensation for any lost wages or diminution in earning capacity, meaning the loss of plaintiff's capacity to work and earn a living that you find were proximately caused by the defendant's unlawful conduct.  No evidence of the value of tangible things, such as physical pain and suffering, needs to be introduced.  There's no exact standard by which you can measure the money equivalent of such an injury.  The only measuring stick is the collective enlightened conscience of the jury.  The law leaves it up to the fairness and common sense of the jury to determine the amount of these damages.  In this difficult task of putting a money figure on an aspect of injury that does not readily lend itself to an evaluation in terms of money, you should try to be fair, objective, and dispassionate, and not be unduly swayed by sympathy for the plaintiffs or for the defendant.  Once you have calculated each of these areas of damages, medical expenses, pain and suffering, mental and emotional distress, reputational harm, lost wages or earning capacity and so on, you should add them up to arrive at the total award.  There must not be any overlapping of the various elements constituting the damages.  The total sum must be fair compensation for the entire injury, no more and no less.  In other words, if you decide that a plaintiff is entitled to compensatory damages for more than one of his claims, any damages awarded for one claim must not be duplicative of any damages you award for the other claim.  Damages should not be awarded more than once for the same injury.  Compensatory damages aim to make the plaintiff whole, and he may not recover more than he has lost.

[Day 6 at 34:3–35:21].  Viliena primarily takes issue with the discrepancy between the compensatory amounts awarded here ($1.75 million for Boniface, $1.25 million for Ysemè, and $1.5 million for Martyr) and the amounts recovered in Haiti ($17,496 for Boniface, $14,315 for Ysemè, and $15,905 for Martyr), as well as the fact that "damages represented many multiples of their annual earnings."  [ECF No. 262 at 13].  He then states that otherwise "plaintiff provided no evidence on damages."  [Id.].

Viliena ignores that the jury heard ample evidence regarding, for example, Eclesiaste's killing which led to the separation of his family and continuing threats, [Day 2 at 23:5–14, 29:13–33:10]; Ysemè's ongoing and consistent pain due to his injuries; and his inability to live with his family due to ongoing fear for his safety, [id. at 62:4–25, 87:10–20]; and Nissage Martyr's amputated leg and the ongoing threats to his family, [id. at 64:25–65:3; Day 4 at 87:8–88:6]. As the Court explained to the jury, "[n]o evidence of the value of tangible things, such as physical pain and suffering, needs to be introduced. . . . The law leaves it up to the fairness and common sense of the jury to determine the amount of these damages." [Day 6 at 34:22–35:3]. The Court will not upend the jury's collective decision here, even if it would have found a lesser amount itself. See McDonald v. Fed. Laby's, Inc., 724 F.2d 243, 247 (1st Cir. 1984) (where Plaintiff "suffered, and will continue to suffer for an indeterminate time into the future, considerable physical pain, humiliation, and the loss of meaningful business, social and home life," finding that "[p]lacing a value on human suffering is always a subjective enterprise, turning on the jury's sensibilities to the facts and circumstances presented in a particular case. Though [the First Circuit], like the trial judge, may have awarded a lesser amount, [it] cannot say that the jury so overstepped its bounds as to 'shock the conscience' of th[e] court." (citing Mitchell v. Evelyn C. Brown, Inc., 310 F.2d 420, 425 (1st Cir. 1962)).

Regarding punitive damages, as an initial matter, they have been awarded in TVPA cases. See Ditullio v. Boehm, 662 F.3d 1091, 1102 (9th Cir. 2011) ("revers[ing] district court's determination that punitive damages are unavailable under the TVPA"); cf. Xuncax v. Gramajo, 886 F. Supp. 162, 199–200 (D. Mass. 1995) (although declining to find retroactive punitive damages under the TVPA, noting that "it appears the statute was designed not simply to compensate the victims of torture, but with an eye toward eradicating the evil altogether. In the

civil context, of course, to prevent or deter heinous behavior is the particular province of punitive

or exemplary damages.").

Here, the Court provided the following instruction to the jury, which Defendant has not

taken issue with:

> In addition to awarding damages to compensate the plaintiff, you may, but are not
> required to, award plaintiff punitive damages if you find that the acts of the
> defendant were wanton, reckless, or malicious.  . . . The purpose of punitive
> damages is not to compensate the plaintiff but to punish the defendant and thereby
> discourage the defendant and others from acting in a similar way in the future.

> An act is malicious when it is done deliberately with knowledge of the plaintiffs'
> rights and with the intent to interfere with those rights.  An act is wanton and
> reckless when it demonstrates conscious indifference and utter disregard of its
> effect upon the health, safety and rights of others.  If you find the defendant's acts
> were not wanton or reckless or malicious, you may not award punitive damages.
> On the other hand, if you find that defendant's acts were wanton and reckless or
> malicious, you may award plaintiffs punitive damages.  Punitive damages are
> appropriate only for especially shocking and offensive misconduct.

> In arriving at your decision as to the amount of punitive damages, you should
> consider the nature of what the defendant did, including the character of the
> wrongdoing, whether the conduct was done with an improper motive or with
> vindictiveness, whether the act or acts constituted outrageous or oppressive
> intentional misconduct, defendant's awareness of the harm and potential harm
> caused by the conduct, how often defendant engaged in similar conduct, and any
> effort to conceal or cover up the wrongdoing.

> There is no exact standard for fixing the amount of punitive damages.  The amount
> can be as large as you believe is necessary to fulfill the purpose of punitive
> damages, but the amount of punitive damages that you award must be fair,
> reasonable and proportionate to the actual and potential harm suffered by plaintiffs,
> and to the compensatory damages you award to plaintiffs.  Generally speaking, this
> means that the ratio of punitive damages to compensatory damages must not exceed
> a 9:1 ratio.  The nature of defendant's conduct, including how offensive you find
> the conduct, is an important factor in deciding the amount of punitive damages.

[Day 6 at 35:22–37:11]; see also BMW of N.A., Inc. v. Gore, 517 U.S. 559, 574–75 (1996)

(explaining "[t]hree guideposts" that should be used to assess the fairness of punitive damages:

(1) the "degree of reprehensibility" of the conduct; (2) "the disparity between the harm or

potential harm" and the punitive award; and (3) "the difference between" the punitive damages

amount "and the civil penalties authorized or imposed in comparable cases").  The jury heard evidence that Viliena participated in and/or directed the organized killing and/or torture of the Plaintiffs and/or their family members, see, e.g., [Day 2 at 55:25–56:12 (Viliena "busted [Nissage's] head with [his] gun."), 56:22–57:9 (Viliena "beat[] [Ysemè] up[,] . . . hitting [him] all over [his] face, [his] body" and said "I'm going to put a noose around your neck, and then I'm going to hang you on the public plaza."), 58:25–59:6 (Viliena told Duclona to shoot Ysemè); Day 3 at 17:2–7 (Viliena "became mayor with his group of gangs, they started killing people, the beat people up."), 39:3–23 (Lebon testified that it was Viliena who shot Eclesiaste), 61:8–18 (Mers Ysemè testified that Viliena told Hautefort that "[a]s we don't find Davis, let's shoot Eclesiaste like, in his place."), 63:24–65:4 (Viliena ordered the shooting of Nissage Martyr); Day 4 at 64:11–13 (Viliena led the attack on the Radio Station)], persisted in threats to these individuals when they pursued a remedy for that reprehensible conduct, see, e.g., [Day 2 at 29:13–31:22 (threats to David Boniface), 86:17–87:14 (threats to Ysemè); Day 4 at 87:8–88:6 s(threats to Nissandère Martyr)], and the jury's punitive damages award was proportional to the compensatory amounts they awarded, see, e.g., [Verdict].  Under these circumstances, the jury's award was not so "grossly excessive" as to warrant remitter of damages, and the Court declines to do so.  See BMW, 517 U.S. at 568.

**IV.    CONCLUSION**

Accordingly, Viliena's motion, [ECF No. 261], is DENIED.

**SO ORDERED.**

April 8, 2024                                             /s/ Allison D. Burroughs
                                                         ALLISON D. BURROUGHS
                                                         U.S. DISTRICT JUDGE