UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| | * |
| DAVID BONIFACE, NISSANDÈRE MARTYR, and JUDERS YSEMÉ, | * |
| | * |
| | * |
| Plaintiffs, | * |
| | * |
| | Civil Action No. 17-cv-10477-ADB |
| v. | * |
| | * |
| JEAN MOROSE VILIENA, | * |
| | * |
| Defendant. | * |
| | * |

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

Before the Court is Defendant Jean Morose Viliena's motion for reconsideration, [ECF No. 66], of the Court's order, [ECF No. 56], denying in part Viliena's motion to dismiss, [ECF No. 46].  For the following reasons, the motion is **<u>DENIED</u>**.

I.      **BACKGROUND**

      **A.      Factual Background**

The facts underlying this case are fully set forth in the First Circuit's opinion in <u>Boniface v. Viliena</u>, 145 F.4th 98 (1st Cir. 2025), as well as in prior orders of this Court, <u>see, e.g.</u>, [ECF No. 191].  In sum, Plaintiffs, Haitian citizens, seek damages from Viliena, also a Haitian citizen, for violence that he allegedly committed against them and their families when all parties were resident in Haiti.

### B.    Procedural History

In the interests of clarity and brevity, the Court recounts only the procedural history that is relevant to this order.  Plaintiffs filed their complaint in March 2017.  [ECF No. 1].  In March 2018, Viliena moved to dismiss for lack of subject matter jurisdiction and failure to state a claim, arguing that the two bases asserted by Plaintiffs for this Court's jurisdiction—the Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note), and the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350—did not reach the claims at issue in this case because they concern actions that occurred entirely outside the United States and involved only foreign citizens.  [ECF No. 46].  The Court dismissed the claim arising under the ATS but permitted the TVPA claims to proceed.  [ECF No. 56 at 14–16].

Viliena moved for reconsideration of the motion to dismiss and, in the alternative, for certification of an interlocutory appeal.  [ECF No. 60].  The Court denied the motion for reconsideration but certified an interlocutory appeal of its order denying Viliena's motion to dismiss.  [ECF No. 84 at 14–18].  The First Circuit denied Viliena's petition for interlocutory appeal.  See Boniface, 145 F.4th at 112.  In March 2023, the case proceeded to trial.  [ECF No. 231].  Following a seven-day trial, a jury found for Plaintiffs and awarded approximately $15.5 million in compensatory and punitive damages.  [ECF No. 250].  Thereafter, Viliena moved for judgment as a matter of law, [ECF No. 261], which the Court denied, [ECF No. 273].  Viliena appealed.  [ECF No. 274].

On July 21, 2025, the First Circuit issued its decision on the appeal, which partially vacated the Court's denial of the earlier motion for reconsideration.  [ECF No. 278].  The First Circuit set forth two distinct questions for the Court to consider on remand: whether the text of the TVPA "provide[s] a cause of action for the facts [of this case]" and if so, whether Congress

2

had the constitutional authority to enact such a provision, which would "authorize civil liability . . . for acts committed by one foreign national upon another foreign national in a foreign country." Boniface, 145 F.4th at 112.

## II.    DISCUSSION

### A.    Whether the TVPA Provides a Cause of Action for the Facts of this Case

At issue is whether the text of the TVPA should be read to apply to claims of torture and extrajudicial killing that took place between foreign nationals on foreign soil.  The Supreme Court set forth the method to be applied by lower courts when deciding whether a statute applies extraterritorially in Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010), and further clarified it in RJR Nabisco, Inc. v. European Community, 579 U.S. 325 (2016).  See Boniface, 145 F.4th at 122–23 (Lynch, J., concurring); William S. Dodge, The New Presumption Against Extraterritoriality, 133 Harv. L. Rev. 1582, 1603–04 (2020).  That inquiry proceeds in two steps. First, the Court asks whether the statute contains a "clear indication of extraterritorial effect," which may be expressly stated in the statute or inferred from context.  RJR Nabisco, 579 U.S. at 340; see also Morrison, 561 U.S. at 265.  Then, if there is no "affirmative indication . . . [that the statute] applies extraterritorially," Morrison, 561 U.S. at 265, the Court consults the facts to determine whether the relief sought requires "no more than domestic application" of the statute, id. at 266.  Here, at the first step of the RJR Nabisco inquiry, the Court concludes that the TVPA, given its "most faithful reading," Morrison, 561 U.S. at 265 (quoting id. at 280 (Stevens, J., concurring in the judgment)), contains a clear affirmative indication of extraterritorial effect.

### 1.    Statutory Text

The Court begins with the statutory text.  The TVPA establishes liability for individuals who commit either torture or extrajudicial killing "under actual or apparent authority, or color of

law, of any foreign nation," 28 U.S.C. § 1350 note § 2(a), and requires plaintiffs to exhaust "adequate and available remedies in the place in which the conduct giving rise to the claim occurred," id. § 2(b).  Other circuits have concluded that § 2(a) is "naturally understood to address primarily conduct occurring in the territory of foreign sovereigns," Chowdhury v. Worldtel Bangl. Holding, Ltd., 746 F.3d 42, 51 (2d Cir. 2014), and that it contemplates claims arising outside the territorial jurisdiction of the United States, see id.; Doe v. Drummond Co., 782 F.3d 576, 601–02 (11th Cir. 2015).  The Court agrees.   Although the statute does not explicitly say "this law applies abroad," Morrison, 561 U.S. at 265, it does not need to, because "context can be consulted as well," id., and here the context is decisive.  To take just one example, most instances of torture under the actual authority of a foreign nation will occur in other lands.  The same is true of extrajudicial killing under color of a foreign nation's law.  The fact that most, if not all, acts covered by the plain language of this provision will occur in other lands between foreign citizens indicates a clear intent for the statute to apply extraterritorially. See Kiobel v. Royal Dutch Petrol. Co., 569 U.S. 108, 138 (2013) (Breyer, J., concurring) (treating the TVPA as authorizing civil damages against "foreign perpetrators of serious crimes committed against foreign persons abroad," id. at 137); id. at 125 (Kennedy, J., concurring) (noting more generally that "[m]any serious concerns with respect to human rights abuses committed abroad have been addressed by Congress in statutes such as the [TVPA]").

Section 2(b) of the statute, which requires exhaustion of "adequate and available remedies in the place in which the conduct giving rise to the claim occurred," 28 U.S.C. § 1350 note § 2(b), accords with this interpretation.  The provision contemplates claims arising in places

4

where there is no meaningful remedy at law for torture or extrajudicial killing, which would not make sense if claims could only arise in the United States.[1]

Taken together, these two sections—which comprise the majority of the statute's substantive contents—give a clear indication of extraterritorial application.

### 2.    Legislative History

Generally, "there is no reason to look past the statutory text itself if that text is unambiguous and consistent with a coherent statutory scheme," United States v. Freeman, 147 F. 4th 1, 13–14 (1st Cir. 2025) (first citing Penobscot Nation v. Frey, 3 F.4th 484, 490 (1st Cir. 2021); and then citing City of Providence v. Barr, 954 F.3d 23, 31–32 (1st Cir. 2020)); accord Lamie v. U.S. Tr., 540 U.S. 526, 536 (2004), and "legislative history may not be used to alter text," Merlini v. Canada, 940 F.3d 801, 803 (1st Cir. 2019) (Lynch, J., dissenting from denial of rehearing en banc) (citing Food Mktg. Inst. v. Argus Leader Media, 588 U.S. 427, 436 (2019)). Nonetheless, for the avoidance of doubt, the Court addresses the parties' arguments about legislative history, see CC/Devas (Mauritius) Ltd. v. Antrix Corp., 605 U.S. 223, 236 (2025) (discussing legislative history "[t]o the extent it is relevant"), as well as the issues identified in Judge Lynch's concurrence in the First Circuit's decision vacating this Court's previous order, see Boniface, 145 F.4th at 122–26.

---

[1] Additionally, if the statute only contemplated domestic exhaustion, the available remedial pathways—primarily state tribunals and state or federal administrative agencies—were known to Congress and could have been stated with specificity, see, e.g., 28 U.S.C. § 2254(b)(1)(A) (requiring habeas petitioners in state custody to exhaust "the remedies available in the courts of the State"); 42 U.S.C. § 1997e(a) (requiring plaintiffs to exhaust "such administrative remedies as are available" before bringing a prison-conditions action), as opposed to the vague "remedies in the place [where the conduct occurred]," 28 U.S.C. § 1350 note § 2(b).

i.      Senate and House Reports

Plaintiffs direct the Court to the language contained in the respective committee reports

on the TVPA. [ECF No. 294 ("Pls.' Mem.") at 12]. The Senate report explained the need to

which the TVPA responded as follows:

> Despite universal condemnation of [torture and execution], many of the world's
> governments still engage in or tolerate torture of their citizens, and state authorities
> have employed extrajudicial killings to execute many people. . . .
>
>         . . . .
>
>         The purpose of this legislation is to provide a Federal cause of action against
> any individual who, under actual or apparent authority or under color of law of any
> foreign nation, subjects any individual to torture or extrajudicial killing. This
> legislation will carry out the intent of the [United Nations] Convention Against
> Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, which
> was ratified by the U.S. Senate on October 27, 1990. The convention obligates
> state parties to adopt measures to ensure that torturers within their territories are
> held legally accountable for their acts. This legislation will do precisely that—by
> making sure that torturers and death squads will no longer have a safe haven in the
> United States.
>         Judicial protection against flagrant human rights violations is often least
> effective in those countries where such abuses are most prevalent. A state that
> practices torture and summary execution is not one that adheres to the rule of law.
> Consequently, the Torture Victim Protection Act (TVPA) is designed to respond to
> this situation by providing a cause of action in U.S. courts for torture committed
> abroad.

S. Rep. No. 102-249, at 3–4 (1991). The House report contains similar language:

> [R]ecent international initiatives seeking to address [official torture and summary
> execution] have placed special emphasis on enforcement measures. A notable
> example is the Convention Against Torture and Other, Cruel, Inhuman or
> Degrading Treatment or Punishment, which was [adopted by the United Nations in
> 1984 and ratified by the United States in 1990] . . . . Essentially enforcement-
> oriented, this Convention obligates state parties to adopt measures to ensure that
> torturers are held legally accountable for their acts.
>         One such obligation is to provide means of civil redress to victims of torture.
> Judicial protections agains[t] flagrant human rights violations are often least
> effective in those countries where such abuses are most prevalent. A state that
> practices torture and summary execution is not one that adheres to the rule of law.
> The general collapse of democratic institutions characteristic of countries scourged

6

> by massive violations of fundamental rights rarely leaves the judiciary intact.  The
> Torture Victim Protection Act would respon[d] to this situation.

H. Rep. No. 102-367, at 3 (1991).  Both the Senate and the House reports emphasize the TVPA's provision of a remedy for acts committed in "state[s] that . . . [do not] adhere[] to the rule of law," S. Rep. No. 102-249, at 3, and countries that have suffered a "general collapse of democratic institutions [that] . . . rarely leaves the judiciary intact," H. Rep. No. 102-367, at 3. This emphasis supports the conclusion that the wrongs to be remedied by the TVPA include those occurring in other countries.

ii.      Tel-Oren v. Libyan Arab Republic

Viliena urges the Court to conclude that the TVPA was enacted in response to a concurring opinion by Judge Bork in a case decided by the D.C. Circuit shortly before the TVPA's enactment.  [ECF No. 290 ("Def.'s Mem.") at 8].  In Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir. 1984) (per curiam), a panel of the D.C. Circuit affirmed the dismissal of an action by "survivors and representatives of persons murdered in an armed attack on a civilian bus in Israel," id. at 775, with each judge writing a separate concurrence setting forth his own reasons for the decision.  As relevant here, Judges Edwards and Bork disagreed about whether the ATS provides a cause of action or merely a jurisdictional grant.[2]  Compare id. at 777–79 (Edwards, J., concurring), with id. at 801 (Bork, J., concurring).  Invoking the separation of powers, id. at 801–02, Judge Bork refused to read an implied cause of action into the ATS and

---

[2] The Supreme Court subsequently resolved the question in Sosa v. Alvarez-Machain, 542 U.S. 692 (2004), concluding that the ATS empowers federal district courts to recognize causes of action at common law for violation of "norm[s] of international character accepted by the civilized world and defined with a specificity comparable to the features of [certain] 18th-century paradigms."  Id. at 725; accord Kiobel, 569 U.S. at 115.

instead would have required "an explicit grant of a cause of action before a private plaintiff [could] be allowed to enforce principles of international law in a federal tribunal," id. at 801.

In Viliena's view, the TVPA was only enacted to provide the substantive cause of action that Judge Bork said was missing in Tel-Oren, [Def.'s Mem. at 8], and the TVPA was thus subject to "the limits of the jurisdictional grant afforded by the ATS," id. The Court disagrees. The House report said the following about Tel-Oren:

> The TVPA would establish an unambiguous and modern basis for a cause of action that has been successfully maintained under an existing law, [the ATS] . . . . [The ATS] has other important uses and should not be replaced. There should also, however, be a clear and specific remedy, not limited to aliens, for torture and extrajudicial killing.
>
> . . . .
>
> . . . At least one Federal judge . . . [has] questioned whether [the ATS] can be used by victims of torture committed in foreign nations absent an explicit grant of a cause of action. In [Tel-Oren], . . . Judge Bork questioned the existence of a private right of action under the [ATS], reasoning that separation of powers principles required an explicit—and preferably contemporary—grant by Congress of a private right of action before U.S. courts could consider cases likely to impact on U.S. foreign relations.
> The TVPA would provide such a grant, and would also enhance the remedy already available under [the ATS] in an important respect: While the [ATS] provides a remedy to aliens only, the TVPA would extend a civil remedy also to U.S. citizens who may have been tortured abroad.

H. Rep. No. 102-367, at 3–4. The Senate report contains substantially similar language. S. Rep. No. 102-249, at 4–5. Both the Senate and House reports note, however, that Judge Bork's approach was in the minority: an earlier case, Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980), had permitted a case arising out of similar facts to proceed under the ATS, see id. at 887–88. See S. Rep. No. 102-249, at 4–5; H. Rep. No. 102-367, at 3–4. The reports thus only discuss Tel-Oren to illustrate that one benefit of the TVPA would be an "unambiguous and modern basis" in law for claims arising out of foreign torture, H. Rep. No. 102-367, at 3, given that

another possible basis—an implied cause of action under the ATS—had been questioned by some judges.  It does not follow that the geographic reach of the TVPA should be limited by Judge Bork's analysis of the ATS in his Tel-Oren concurrence.

iii.      The Convention Against Torture

Though the parties have not raised the issue, Judge Lynch, concurring in Boniface, noted that "[t]he preamble of the TVPA states that it is '[a]n Act to carry out obligations of the United States under the United Nations Charter and other international agreements pertaining to the protection of human rights.'"  145 F.4th at 125 (Lynch, J., concurring) (quoting Pub. L. No. 102-256, 106 Stat. 73 (1992)).  Judge Lynch observed that Congress may thus have "justified the enactment of the TVPA to implement the United Nations Convention Against Torture," or CAT.  Id. at 122; see U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, June 26, 1987, 1465 U.N.T.S. 113.  Ultimately, the Court concludes that the evidence connecting the TVPA to the CAT is not clear enough to imply limits arising from the CAT where those limits are not present in the plain language of the TVPA.

At the outset, the Court notes that the CAT is not expressly mentioned in the statement of purpose of the TVPA.  Rather, the statement refers to several unspecified "international agreements pertaining to the protection of human rights," including "the United Nations Charter."  Pub. L. No. 102-256, 106 Stat. 73 (1992).  The CAT may have been one of those international agreements or it may have been included in the reference to the United Nations Charter, but evidence from the committee reports suggests that the TVPA took a distinct approach to regulating torture and extrajudicial killing that was informed by the CAT, but not coextensive with it.

9

The Senate report stated that the TVPA would "carry out the intent of the [CAT], which . . . obligates state parties to . . . ensure that torturers within their territories are held legally accountable for their acts," by "making sure that torturers and death squads will no longer have a safe haven in the United States." S. Rep. No. 102-249, at 3.  While the report noted the TVPA's consistency with the "intent" of the CAT, id., such consistency does not imply that the TVPA reached only what was required by the CAT and nothing more.  The TVPA is fundamentally "a statement of the United States' stance toward particular acts of official torture and extrajudicial killing, and while it demonstrates a desire to comply with international law, it sets forth the terms of such compliance in a static and unilateral manner."  Philip Mariani, Comment, Assessing the Proper Relationship Between the Alien Tort Statute and the Torture Victim Protection Act, 156 U. Pa. L. Rev. 1383, 1426 (2008).  Thus, the TVPA may have partially implemented the CAT by providing a remedy at law for certain kinds of torture, but the Court is not persuaded that the reverse proposition is true—that the CAT's ratification history should be read to impose a ceiling on the relief available under the TVPA.  This is especially so because the Senate committee report also stated quite clearly that "the [TVPA] is designed to . . . provid[e] a civil cause of action in U.S. courts for torture committed abroad."  S. Rep. No. 102-249, at 3–4.

Indeed, in the same committee report, Senators Simpson and Grassley expressed opposition to the TVPA precisely because it created tension with the CAT.  It permitted, they believed, "a foreign national who commits torture in a foreign country [to] be held liable in a U.S. court, no matter the victim's domicile," whereas the CAT "specifically declined to extend coverage to acts committed outside the country in which the lawsuit is brought."  S. Rep. No. 102-249, at 13.  Evidence from the House committee report's discussion of the CAT is

equivocal.  It simply identifies the CAT as one "notable example" of "international initiatives seeking to address [the] human rights violations" of official torture and summary execution.  H. Rep. No. 102-367, at 3.  At most, this language suggests that the House committee understood the TVPA and CAT to exist concurrently, but not that the TVPA was a domestic implementation of the CAT's international norm.

iv.     <u>Summary</u>

The legislative history does not contradict the clear language of the TVPA.  The Court concludes that the TVPA's substantive prohibition extends to acts of torture and extrajudicial killing outside the United States.

**3.     Whether to Distinguish Substance from Jurisdiction**

Viliena next contends that the Court should distinguish the TVPA's substantive prohibitions—which might include acts between noncitizens on foreign soil—from its jurisdictional reach.  <u>See</u> [Def.'s Mem. at 8].  It is true that Congress sometimes imposes narrow jurisdictional prerequisites to otherwise broad substantive prohibitions in order to respect the constitutional bounds of its legislative authority:

> "Congress cannot punish felonies generally," <u>Cohens v. Virginia</u>, 6 Wheat. 264, 428 . . . (1821); it may enact only those criminal laws that are connected to one of its constitutionally enumerated powers, such as the authority to regulate interstate commerce.  As a result, most federal offenses include, in addition to substantive elements, a jurisdictional one, like the interstate commerce requirement of [18 U.S.C.] § 844(i).  The substantive elements "primarily define[] the behavior that the statute calls a 'violation' of federal law," <u>Scheidler v. National Organization for Women, Inc.</u>, 547 U.S. 9, 18 . . . (2006) . . . .  The jurisdictional element, by contrast, ties the substantive offense . . . to one of Congress's constitutional powers . . . , thus spelling out the warrant for Congress to legislate.

<u>Torres v. Lynch</u>, 578 U.S. 452, 457 (2016).  Viliena would have the Court discover a similar jurisdictional constraint here, arguing that "while Congress may have intended . . . the TVPA [to apply to] . . . actions which occurred outside the United States, it does not necessarily follow that

11

it also intended [the TVPA to apply to] . . . actions that did not touch or concern the United States."  [Def.'s Mem. at 7].

The distinction Viliena proposes is plausible.  Torres concerned a federal law that criminalizes the destruction of property "by means of fire," but only when the property is "used in . . . or . . . affecting interstate or foreign commerce," 8 U.S.C. § 844(i).  578 U.S. at 456.  The "interstate or foreign commerce" provision guarantees that the law is within Congress's constitutional commerce power.  Cf. United States v. Lopez, 514 U.S. 549, 567 (1995) (invalidating federal criminal statute lacking a jurisdictional hook for reaching beyond actions affecting interstate commerce).  In the extraterritoriality context, the Supreme Court drew a somewhat analogous distinction in RJR Nabisco, treating the substantive provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, separately from the private right of action provided under that act.  579 U.S. at 335 ("First, do RICO's substantive prohibitions, contained in § 1962, apply to conduct that occurs in foreign countries?  Second, does RICO's private right of action, contained in § 1964(c), apply to injuries that are suffered in foreign countries?").  The majority concluded that the substantive prohibitions of RICO did reach certain extraterritorial conduct, id. at 338, but that the private right of action required a plaintiff to suffer a domestic injury, id. at 346.

The TVPA is different, however, from RICO and the other criminal laws to which Viliena refers, because it contains no separate clause that could be read to impose such a jurisdictional limitation.  The statutes in both Torres and RJR Nabisco contained a distinct textual hook providing a structural reason to think that Congress intended to limit jurisdiction to a subset of the conduct described by those statutes' substantive provisions.  By contrast, the right of action granted by the TVPA is contained in its substantive provisions, meaning that "there is

12

no statutory text to examine other than the text of the underlying provision." Dodge, <u>supra</u>, at 1620. Where the underlying provision applies extraterritorially, the Court must be particularly wary of "reading into" the statute a domestic-nexus requirement that "Congress did not prescribe." <u>RJR Nabisco</u>, 579 U.S. at 356, 363 (Ginsburg, J., concurring in part and dissenting in part).

Because there is no textual reason for treating the jurisdictional reach of the implied private right of action under the TVPA differently from its substantive provisions, the Court concludes that the TVPA's right of action, too, extends to foreign harms and foreign parties.

### 4.     Constitutional Avoidance

If "after the application of ordinary textual analysis, [a] statute is found to be susceptible of more than one construction," <u>Jennings v. Rodriguez</u>, 583 U.S. 281, 296 (2018) (quoting <u>Clark v. Martinez</u>, 543 U.S. 371, 385 (2005)), and one of those constructions would raise a serious constitutional question, the Court must ask "whether a construction of the statute is fairly possible by which the question may be avoided," <u>id.</u> (quoting <u>Crowell v. Benson</u>, 285 U.S. 22, 62 (1932)). But "[i]n the absence of more than one plausible construction," <u>id.</u>, the constitutional avoidance canon "simply 'has no application,'" <u>id.</u> (quoting <u>Warger v. Shauers</u>, 574 U.S. 40, 50 (2014)), because while "[s]tatutes should be construed to avoid constitutional questions, . . . [the] canon is not a license for the judiciary to rewrite language enacted by the legislature," <u>United States v. Albertini</u>, 472 U.S. 675, 680 (1985) (citing <u>Heckler v. Mathews</u>, 465 U.S. 728, 741–42 (1984)).

Here, the statutory language is not susceptible of another construction, and the Court may not depart from its meaning "simply because . . . [it] is challenged on constitutional grounds." <u>Albertini</u>, 472 U.S. at 680. Far from being "an exercise in judicial restraint," contorting the

13

TVPA to limit its reach "would trench upon the legislative powers vested in Congress by Art. I, § 1, of the Constitution." Id. (citing United States v. Locke, 471 U.S. 84, 95–96 (1985)). Finding no possible alternative construction, the Court will reach the constitutional question.

### B.      Whether the Cause of Action is Constitutional

"The Federal Government's '"inherent" foreign affairs power,' 'like every other governmental power, must be exercised in subordination to the applicable provisions of the Constitution.'" Fuld v. Pal. Liberation Org., 606 U.S. 1, 19 (2025) (quoting Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 416 n.9 (2003)).  "[E]ven legislation implicating foreign policy issues" will be invalidated if it "crosse[s] a constitutional line." Id. (citing Holder v. Humanitarian Law Proj., 561 U.S. 1, 34 (2010)).  The parties agree that if Congress had the power to create the cause of action at issue here, it derived from the Offences Clause, U.S. Const. art. I, § 8, cl. 10, which provides that Congress shall have the power to "define and punish . . . Offences against the Law of Nations." [Def.'s Mem. at 13]; [Pls.' Mem. at 22].  They disagree, however, about whether the TVPA exceeds the scope of that power, largely due to conflicting interpretations of the phrase "Offences against the Law of Nations."

Viliena argues that the Court should interpret "the Law of Nations" to refer to customary law established in the course of the United States's "intercourse with foreign nations" at the Founding.  [Def.'s Mem. at 13 (quoting The Federalist No. 42 (James Madison) at 264 (Clinton Rossiter ed., 1961))].  He submits that the Offences Clause "codified the law of nations as it was known in 1787–1789, referring to the rights of independent sovereign states to punish offenses against other sovereign states pursuant to the then recognized rules of man invested by natural law and thought to be changing and immutable." [Id. at 14].  Viliena asserts that Congress's Offences Clause power is thus limited by certain principles of international law as it existed at

14

the Founding, including "traditional notions of comity between nations," [id. at 16]. See [id. at 17].

Plaintiffs disagree. They define the law of nations in reference to modern sources and conclude that, under modern international law, "[t]orture and extrajudicial killing are paradigmatic offenses." [Pls.' Mem. at 22]; see [id. at 22–23 (collecting sources)]. At a minimum, Plaintiffs contend, the Offences Clause is not a fossil of international law as it existed in 1789 but rather capable of organically taking on new meaning as changes occur in "positive law derived from the customs of nations." [Id. at 24 (quoting Charles D. Siegal, Deference and Its Dangers: Congress' Power to 'Define . . . Offenses Against the Law of Nations,' 21 Vand. J. Transnat'l L. 865, 880 (1988))].

In contemporary vernacular, the Offences Clause empowers Congress to punish offenses against "customary international law." United States v. Bellaizac-Hurtado, 700 F.3d 1245, 1251 (11th Cir. 2012) (first citing Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252 (11th Cir. 2009), abrogated on other grounds by Mohamad v. Palestinian Auth., 566 U.S. 449, 452–53 & n.2 (2012); then citing Abagninin v. AMVAC Chem. Corp., 545 F.3d 733, 738 (9th Cir. 2008); and then citing Flores v. S. Peru Copper Corp., 414 F.3d 233, 237 n.2 (2d Cir. 2003)). Whether the clause refers to current customary international law or that of the Founding is unresolved by higher courts, but arguably dispositive here.

In the view of this Court, the best understanding of the scope of the Offences Clause in light of related precedent is that it "expands and contracts with changes in customary international law." Bellaizac-Hurtado, 700 F.3d at 1253. The Supreme Court gave extended discussion to the law of nations as understood at the Founding in a case concerning the ATS, which uses the same phrase, 28 U.S.C. § 1350. It explained:

15

> In the years of the early Republic, th[e] law of nations comprised two principal elements, the first covering the general norms governing the behavior of national states with each other . . . [and] a second, more pedestrian element, . . . a body of judge-made law regulating the conduct of individuals situated outside domestic boundaries [such as in cases involving shipwrecks, hostages, or ransoms]. . . .
>
> There was, finally, a sphere in which . . . rules binding individuals for the benefit of other individuals overlapped with the norms of state relationships. Blackstone referred to it when he mentioned three specific offenses against the law of nations addressed by the criminal law of England: violation of safe conducts, infringement of the rights of ambassadors, and piracy. 4 [William Blackstone,] Commentaries [on the Laws of England] 68 [(1769)]. . . . It was this narrow set of violations of the law of nations, admitting of a judicial remedy and at the same time threatening serious consequences in international affairs, that was probably on [the] minds of the men who drafted the ATS . . . .

Sosa v. Alvarez-Machain, 542 U.S. 692, 714–15 (2004).  In light of that history, the Supreme Court concluded that the ATS's grant of jurisdiction over any "tort . . . committed in violation of the law of nations," 28 U.S.C. § 1350, theoretically contemplated limited judicial recognition of new law-of-nations torts.  Id. at 724–25; cf. Nestlé USA, Inc. v. Doe, 593 U.S. 628, 639–40 (2021) (noting the "many different ways to create a cause of action that would enforce developments in international law beyond the three historical torts identified in Sosa," id. at 639, and concluding that apart from those three torts, the ability to recognize new causes of action belonged to Congress, not courts).

In the absence of more specific precedent defining the outer bounds of the Offences Clause, the Court concludes that Sosa's analysis of the meaning of "law of nations" in the ATS provides a reliable indicator of the same phrase's meaning in the Offences Clause.  See Bellaizac-Hurtado, 700 F.3d at 1251 ("[T]he Alien Tort Statute was enacted by the First Congress and uses the same term of art—'the law of nations'—that is used in the Offences Clause.  Given the proximity in time between the writing of these provisions and the substantial overlap between the delegates of the Constitutional Convention and the members of the First Congress, one would expect that the Framers understood the term 'the law of nations' in the

16

Offences Clause and the Alien Tort Statute to mean the same thing."); cf. Doe v. Trump, 157 F.4th 36, 59–60 (1st Cir. 2025) (discussing the principle that "[w]here Congress employs a term of art 'obviously transplanted from another legal source,' it 'brings the old soil with it,'" id. at 59 (alteration in original) (quoting George v. McDonough, 596 U.S. 740, 746 (2022) (citation modified))).  If the law of nations evolves such that new torts are capable of being recognized at common law under the ATS, then Congress's power under the Offences Clause must also be capable of expanding in relation to shifting international norms.  Cf. Nestlé, 593 U.S. at 639–40.

There is no doubt that, as Plaintiffs assert, government-sanctioned "torture and extrajudicial killing were universally condemned under the law of nations at the time of the TVPA's enactment."  [Pls.' Mem. at 23]; see [id. at 28–29 (collecting cases)].  On balance, the Court is further persuaded that international law embraces so-called universal jurisdiction over these two specific acts.  The principle of universal jurisdiction is well articulated in the maxim that "[a]ny nation that found a pirate could prosecute him," Sosa, 542 U.S. at 761 (Breyer, J., concurring) (citing United States v. Smith, 18 U.S. 153, 162 (1820)); more simply, an act subject to universal jurisdiction "can be punished by any country no matter where it is committed or by whom," United States v. Dávila-Reyes, 84 F.4th 400, 462 (1st Cir. 2023) (en banc), and "[c]rimes may be universal jurisdiction offenses if they are 'contrary to a peremptory norm of international law' and are 'so serious and on such a scale that they can justly be regarded as an attack on the international legal order,'" id. at 462 n.41 (quoting Eugene Kontorovich, Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction Over Drug Crimes, 93 Minn. L. Rev. 1191, 1224 n.228 (2009)).  Put slightly differently, "[t]here are two premises underlying universal jurisdiction."  Michael P. Scharf, Application of Treaty-Based Universal Jurisdiction to Nationals of Non-Party States, 35 New Engl. L. Rev. 363, 368 (2001).

17

First, the crime must be "so threatening to the international community or so heinous in scope and degree that they offend the interest of all humanity, and any state may, as humanity's agent, punish the offender." Id. Second, the crime must occur either outside of any country's jurisdiction or in a place where the government is "unlikely to exercise jurisdiction, because, for example, the perpetrators are State authorities or agents of the State." Id.

The TVPA, which contemplates state-sanctioned torture and extrajudicial killing, satisfies each of these requirements. Further, and crucially, the international community has recognized torture and summary execution as crimes over which universal jurisdiction exists. See, e.g., Sosa, 542 U.S. at 761–62 (Breyer, J., concurring) (collecting sources) ("Today international law . . . reflect[s] . . . procedural agreement that universal jurisdiction exists to prosecute a subset of [behavior condemned by international law] . . . includ[ing] torture, genocide, crimes against humanity, and war crimes."); U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, June 26, 1987, 1465 U.N.T.S. 113, arts. 5(2), 14. Though the sanctions at issue here are civil, not criminal, the Court sees no reason that Congress's jurisdiction to prosecute these offenses should be limited to providing criminal sanctions as opposed to civil remedies.

Accordingly, the Court, unwilling to interfere with the judgment of the political branches on matters of foreign policy, concludes that Congress was within its constitutional authority pursuant to the Offences Clause in enacting the TVPA.

III.     CONCLUSION

For the foregoing reasons, Viliena's motion for reconsideration, [ECF No. 66], is

**<u>DENIED</u>**.


SO ORDERED.

June 9, 2026                                         */s/ Allison D. Burroughs*
                                                    ALLISON D. BURROUGHS
                                                    U.S. DISTRICT JUDGE